IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANN FINCH, Individually and as Executrix of the Estate of Franklin Delenor Finch, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16-CV-1077 |
| BASF CATALYSTS LLC, et al., | ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

Franklin Finch, the plaintiff's late husband, began working at a Firestone tire factory in Wilson, North Carolina in 1975. Doc. 307-1 at 6. He worked on tire presses there until he retired in 1995. *Id*. Mr. Finch was diagnosed with mesothelioma in March 2016 and died on January 25, 2017. Doc. 303-12 at 5–7. Ms. Finch contends that after 1979, defendant McNeil & NRM, Inc. supplied asbestos-containing platen insulators, gaskets, and other replacement parts to the Firestone plant and that Mr. Finch's exposure to asbestos from these MNRM parts caused his mesothelioma. MNRM moves for summary judgment, contending that the plaintiff has insufficient evidence Mr. Finch was exposed to asbestos from MNRM replacement parts.

The Court will grant summary judgment because no reasonable jury could find on the evidence presented that Mr. Finch's exposure to MNRM's products caused Mr. Finch's mesothelioma. MNRM cannot be liable for injuries caused by asbestos-

containing parts that it did not supply, many of the parts it sold did not contain asbestos, and, for the asbestos-containing gaskets, gear reducers, and platen insulators MNRM did sell, no reasonable jury could conclude that Mr. Finch was exposed to these products with sufficient frequency, regularity, or proximity to support the inference of causation necessary for liability. The Court will grant MNRM's motion to strike to the extent that the answers go beyond simply authenticating documents.

## I. Facts viewed in the light most favorable to the plaintiff.[1]

### A. The Curing Department, the Equipment, and the Parts Sold by MNRM

The Firestone plant in Wilson was built in 1973 and 1974. Another defendant, McNeil Ohio, supplied over 100 asbestos-containing tire presses to the plant at that time.[2] MNRM's predecessor came into existence in 1979. Doc. 289-5 at ¶ 3. Soon thereafter, it bought certain assets from McNeil Ohio. *Id.* at ¶ 4. MNRM sold replacement parts, spare parts, and services for the existing McNeil Ohio presses. *E.g.,* Doc. 289-4 at 13,

---

[1] MNRM disputes many of these facts. At summary judgment, of course, the Court views the evidence in the light most favorable to Ms. Finch, the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The Court has made reasonable efforts to do so, despite the limited help provided by Ms. Finch's briefing. That briefing often camouflaged the issues by glossing over basic but crucial facts, Doc. 32 at ¶ 1 ( court's order indicating that "factual assertions unsupported by citation to specific evidence in the record will be disregarded"), providing exaggerated factual claims that did not match up to the evidence cited, and relying on unstated and often misleading stacked inferences, contravening evidentiary requirements. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that a non-moving party must rely on more than "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence").

[2] It is undisputed that MNRM does not have liability for any harm caused by the tire presses sold before 1979. Doc. 307 at 4 (plaintiff's brief conceding that MNRM is not responsible for the 112 presses sold before October 1979).

26; Doc. 307-20. MNRM did not sell any asbestos-containing tire presses to the plant. *See* Doc. 289-3 at 9.

During his twenty years at the Firestone plant, Mr. Finch worked as a setup man, changing tire molds on these tire presses. Doc. 307-1 at 6, 9; Doc. 307-3 at 25 (noting that "setup man" or "mold changer" refers to the same position). All of the tire presses were in one large open space, referred to as the curing room or curing department. Doc. 307-1 at 6–8. Mr. Finch worked in this room all day, every day. *Id.*

The tire presses were large, Doc. 289-11 and Doc. 289-5 at ¶ 15, and there were many of them: anywhere from 120 to more than 150 over the years Mr. Finch worked there. Doc. 307-1 at 8, 15 (120 tire presses in 1975); Doc. 307-2 at 12 (150 presses in 1980). The curing room was huge: approximately 40 acres with 25-foot-high ceilings. Doc. 289-2 at 5. Many supervisors rode bicycles from point-to-point, Doc. 307-2 at 12, and mold changers, like Mr. Finch, often spent about one-third of their work day commuting around the curing room on fork lifts. Doc. 307-3 at 138–39.

Each tire press held two tire molds and could thus cure or "cook" two tires at a time.[3] Doc. 289-9 at 5. The tire molds on each tire press were bolted onto a platen, which is a flat, steel heating element on either side of the mold; much like a waffle iron, the tire press would close on the mold and the heated platens would cook the green tire in a process involving pressure and heat. Doc. 307-1 at 9; *see also* Doc. 289-9 at 6, 13, 16.

---

[3] As the Court understands it, curing—or "cook[ing]"—a tire is the process of applying heat and pressure to a "green tire" in a mold to impart the final shape and tread onto the tire. *See* Doc. 289-9 at 16.

3

Each tire mold was separately bolted onto the top and bottom platen. Doc. 307-1 at 9; Doc. 289-9 at 6.

Underneath each platen there was a platen insulator, which was designed to hold in heat. Doc. 307-1 at 9–10. The original platen insulators in the tire presses—which MNRM did not sell—contained asbestos. *See* Doc. 289-3 at 5 (noting that the tire industry did not begin to transition away from asbestos-containing products until approximately 1978). The bolts that secured the mold to the platen ran through the platen insulator. Doc. 307-1 at 9–10.

MNRM sold more than 100 platen insulators to the tire plant between 1979 and 1984, Doc. 307-6 at 43–44 and Doc. 289-3 at 7–8, which were made from asbestos-containing Transite board. Doc. 289-12 at 6, 8; *see also* Doc. 289-3 at 7–8, 11 (MNRM expert's report acknowledging that MNRM's invoices show Transite as the material for more than 100 platen insulators). [4] Transite is a Johns Manville product made of Portland cement with added asbestos fibers. Doc. 289-3 at 11; Doc. 307-14.

Each tire press also had two sets of heat shields. The inner heat shields are essentially enclosures that surround the sides of the curing tire to retain heat as the tire

---

[4] Ms. Finch did not specifically direct the Court's attention to evidence disclosing the number of asbestos-containing parts that MNRM sold to the Wilson tire plant. Her brief discussing the extent of such sales is non-specific as to numbers and when she does cite to evidence about sales, she refers to multi-page exhibits without pin cites, *e.g.*, Doc. 307 at 10 (citing to Doc. 307-9, comprising some 28 pages, and Doc. 307-18, comprising some 8 pages), in violation of this Court's Order, Doc. 32 at ¶ 1 (indicating that "factual assertions unsupported by citation to specific evidence in the record will be disregarded" and noting that "citation[s] to a multi-page exhibit must contain a pin cite"), and the Local Rules. LR 7.2(a) (requiring that "[e]ach statement of fact [ ] be supported by reference to a part of the official record in the case"). Because Ms. Finch did not propose alternate numbers to those MNRM's expert provided and that MNRM cited, the Court will rely on these numbers for summary judgment purposes.

cures. Doc. 289-9 at 21–25. The inner heat shields did not contain any insulation. Doc. 289-4 at 19 (noting that these heat shields "had [ ] no material" and instead used an "air gap"). The original outer or secondary heat shields that McNeil Ohio supplied contained asbestos insulation. *See id.*; Doc. 289-3 at 13. After 1979, MNRM shipped 17 sections of these secondary heat shields to the plant, but none contained asbestos. Doc. 289-3 at 13; Doc. 289-12 at 9–10.

MNRM also sold the tire plant more than 2000 asbestos-containing gaskets. Doc. 289-3 at 8.[5] Gaskets were used on the plant's steam system, Doc. 303-12 at 7, and on the steam piping that connected to the press. Doc. 307-2 at 24. There were also a number of gaskets associated with the tire presses. Doc. 307-3 at 64–65. The gaskets that MNRM supplied, however, were internal to the tire press, encased by steel, and not accessible to mold changers. Doc. 289-3 at 9.

Finally, MNRM sold seven gear reducers to the tire plant. Doc. 289-4 at 62. A gear reducer is a pre-assembled unit consisting of the gear, the motor, and the brake and is part of the unloader. *Id.* at 26–27. These gear reducers included Stearns brakes as a component and contained asbestos. *Id.* at 62; Doc. 307-8 at 12–13 (noting that the friction discs in all Stearns brakes contained asbestos until 1986). These particular gear reducers were a part of the unloaders, which were behind the presses and were used to

---

[5] MNRM's Rule 30(b)(6) witness agreed that MNRM invoices showed the sale of "copper asbestos gaskets." Doc. 307-5 at 63 (agreeing that invoices showed sales of 220 copper asbestos gaskets in February 1980, "hundreds" in December 1981, and 300 more on another date in 1981); Doc. 307-9 (various gasket invoices); *see also* Doc. 289-3 at 8 (MNRM's expert report acknowledging invoice evidence that that MNRM shipped 2,060 copper asbestos gaskets and two Raybestos manifold gaskets containing asbestos to Firestone plant).

5

unload the tires from the press after they were cooked. Doc. 321-2 at 6–7. A "loader" and an "unloader" are not the same piece of equipment. *See* Doc. 321-4 at 7 (referring separately to the loader, unloader, and tire press); Doc. 289-5 at ¶ 12 (same). Other than the seven gear reducers, MNRM did not sell any replacement brakes or replacement brake parts to the plant. Doc. 289-3 at 13–14; Doc. 289-4 at 26–27. Nor did MNRM sell any pipe insulation to the plant. Doc. 289-4 at 28.

### B. Mr. Finch's Work at the Plant

Mr. Finch changed multiple tire molds per day for many years. He testified that he worked as a setup man for approximately 19 years and that on average he would change out four tire molds per day. Doc. 307-1 at 6, 12.

To change a tire mold, Mr. Finch would first unbolt the bottom mold from the bottom platen. Doc. 307-1 at 9–10. After Mr. Finch removed the bottom mold, he would then manually remove the top heat shields that blocked his access to the top molds. *Id.* at 10. Each heat shield was one-inch thick and weighed between forty and fifty pounds. *Id.* After removing the top heat shields, Mr. Finch would stand on the edge of the machine and remove the top mold from the top platen. *Id.* The top mold was secured in the same fashion as the bottom mold—i.e., with bolts running from the top platen through the top platen insulator. *Id.* There was also a heat shield adjacent to the bottom tire molds, but it seems that Mr. Finch did not have to remove this to change the bottom molds. *See id.* Before installing the new molds, Mr. Finch would clean the area by blowing off the platen and the platen insulation with compressed air, causing a white powdery dust to rise

6

into the air. *Id*. at 10–11. He would then install the new molds in reverse-order: he re-bolted the top molds, reinstalled the top heat-shields and re-bolted the bottom molds. *Id*.

At any given time, there were five other set-up men changing molds in the curing room at the same time as Mr. Finch. Doc. 307-1 at 13. In addition to these individuals, five mechanics typically worked in the curing room during each shift. *Id*. at 15.

Additional evidence will be discussed as is relevant.

## II. Causation in Asbestos Disease Cases

The Fourth Circuit has held in an asbestos and lung cancer case arising under North Carolina law[6] that the plaintiff "must present 'evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.'" *Jones v. Owens–Corning Fiberglas Corp. & Amchem Prods., Inc.,* 69 F.3d 712, 716 (4th Cir. 1995) (quoting and applying *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1162–63 (4th Cir. 1986), to North Carolina case). This is known as the "*Lohrmann* test" or the "frequency, regularity, and proximity test," and federal courts have applied it routinely for many years to evaluate proximate cause in asbestos cases arising under North Carolina law.[7]

---

[6] The parties have all briefed the motion applying North Carolina law.

[7] *See, e.g., Haislip v. Owens–Corning Fiberglas Corp.,* 86 F.3d 1150 (table), 1996 WL 273686, at *2 (4th Cir. May 23, 1996) (per curiam) (unpublished) (applying *Lohrmann* to North Carolina case involving a plaintiff with mesothelioma); *Yates v. Air & Liquid Sys. Corp.,* No. 5:12–cv–752–FL, 2014 WL 4923603, at *22–23 (E.D.N.C. Sept. 30, 2014), *on reconsideration sub nom. Yates v. Ford Motor Co.*, No. 5:12-CV-752-FL, 2015 WL 9222834 (E.D.N.C. Dec. 17, 2015) (applying "the *Jones/Lohrmann* test" to North Carolina case involving a plaintiff with mesothelioma); *see also Jandreau v. Alfa Laval USA, Inc.,* No. 2:09–91859–ER, 2012 WL 2913776, at *1 n.1 (E.D.Pa. May 1, 2012) (applying *Lohrmann* to North Carolina case involving

7

Mr. Finch need not have worked directly with the defendant's products. *See Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir. 1986). Rather, bystander or indirect exposure may be enough, if the exposure was proximate and significant. *See id.* ("The evidence, circumstantial as it may be, need only establish that [the plaintiff] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled."). But the mere presence of "static asbestos" does not necessarily equate to asbestos exposure. *See Andrews v. A W Chesterton Co.*, No. 2:13-CV-2055-RMG, 2015 WL 12831332, at *2 (D.S.C. June 5, 2015).

## III. Analysis

As noted *supra*, there is evidence that MNRM sold asbestos-containing platen insulators, gaskets, and gear reducers to the Wilson tire plant and that these products were used in the curing room where Mr. Finch worked. However, there is insufficient evidence from which a jury could conclude that Mr. Finch was exposed to asbestos fibers from these MNRM products on a frequent and regular basis.

### A. Platen Insulation

As noted, Ms. Finch has evidence that MNRM sold Firestone approximately 100 asbestos-containing platen insulators over a five-year period. There is no direct evidence as to whether some or all of the MNRM insulators replaced original McNeil insulators,

---

a plaintiff with mesothelioma and predicting that the North Carolina Supreme Court would adopt the *Lohrmann* test).

8

whether some or all replaced other MNRM insulators, or whether the MNRM insulators replaced platen insulators from other companies. Nonetheless, since there were approximately 100 presses in the curing room, and each press had 4 platen insulators, one can infer that MNRM sold possibly as many as a quarter, and no more than a quarter, of the platen insulators in the curing room in the mid-1980s. These insulators were used in the tire presses and Mr. Finch worked near them for several hours a day.

However, the mere presence of asbestos in the platen insulators that MNRM sold is insufficient to establish that asbestos fibers were released into the air while Mr. Finch was working on the presses. Ms. Finch's evidence is that all of the platen insulators sold by MNRM were made of Johns Manville Transite. *Supra*, Part I.A. MNRM has offered evidence that Transite was a hard flat plate made from Portland cement with added asbestos fibers, Docs. 289-3 at 11 and 289-13 at 25, and coated with waterproofing materials. Doc. 289-3 at 11. Because the asbestos fibers were encapsulated in concrete and sealed for water/moisture resistance, the "asbestos fibers would have 'locked-in,' substantially restricting, if not eliminating" the release of asbestos fibers. *Id*. Ms. Finch has offered no evidence to the contrary.[8] *See* Fed. R. Civ. P. 56(e) (noting that a court

---

[8] At oral argument, Ms. Finch directed the Court's attention to an expert report by Dr. Holstein in an effort to show that Transite degraded and released asbestos fibers. However, she did not cite to this evidence in her brief in opposition to MNRM's summary judgment motion. Because "[r]aising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage," the Court find that MNRM's evidence is undisputed. *See N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.,* 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010); *see also* Fed. R. Civ. P. 56(e). Moreover, it violates the Local Rules, which require citation to evidence in the briefs. LR 7.2(a). In any event, Dr. Holstein's report does not clearly support Ms. Finch's argument. *See* Doc. 303-12 at 7–8, 12.

may consider a "fact undisputed" when a party "fails to properly address another party's assertion of fact"); *Catalan v. House of Raeford*, 17 F. Supp. 3d 520, 525 (E.D.N.C. 2014) (facts in moving party's summary judgment motion that are unaddressed or unrebutted are considered uncontroverted for purposes of the motion). In short, MNRM's evidence that any asbestos was encapsulated is not disputed. The presence of such "static asbestos" does not equate to asbestos exposure sufficient to support an inference of causation. *See Andrews*, 2015 WL 12831332, at *2.

The plaintiff contends that Mr. Finch was exposed to asbestos fibers when he "blew off" the platen and the platen insulator every time a tire mold was changed, which Mr. Finch testified caused a white powdery dust to rise into the air. Doc. 307-1 at 10–11; *see also* Doc. 307-2 at 19. However, Ms. Finch has presented no evidence that the white powdery dust contained asbestos fibers from the platen insulators, as opposed to the heat shields or some other part. The platen insulators were sandwiched between the platens and at best only a small surface area of the insulators was exposed. Doc. 289-3 at 11; *see* Doc. 307-1 at 9–10 (noting that the platen insulation was underneath the platen). Ms. Finch's evidence about white powdery dust is not enough to connect the dust to MNRM's insulators or to prove the dust contained asbestos fibers. It does not overcome MNRN's uncontested evidence that the Transite it sold was coated so as not to release fibers.[9]

---

[9] At oral argument, Ms. Finch directed the Court's attention to evidence she submitted in opposition to a summary judgment motion by defendants FMC Corporation and Rexnord Industries, LLC, noting that she incorporated this evidence in her brief in opposition to this motion. Ms. Finch's consolidated opposition to FMC and Rexnord, Doc. 303, is 18 pages long, and incorporation of this brief by reference would result in a brief well outside the word limits

The plaintiff next contends that Mr. Finch was exposed to asbestos fibers when he bolted and unbolted the molds, since the bolts went through the platen insulators. However, MNRM has offered undisputed evidence that the bolts securing the tire molds to the platen did not come into contact with the platen insulators. Doc. 289-4 at 31 (stating that the bolts in question "would never touch the insulator . . . it couldn't touch the insulator"). Moreover, Mr. Finch testified that removing the bolts created "very little" dust. Doc. 307-1 at 9.

Ms. Finch also relies on testimony from a co-worker, Harry Stanton, that he observed maintenance workers performing preventative maintenance or replacing platen insulation on a "daily" basis. Doc. 307-2 at 18. While Mr. Finch did not personally work with the platen insulators, Doc. 289-2 at 6, Mr. Stanton testified that he saw Mr. Finch in the area while maintenance was working on platen insulation "every day." Doc. 307-2 at 18–19. However, Mr. Stanton described the platen insulation as "fibrous," "almost spongy," and "yellow or pink" in color. Doc. 307-2 at 18, 53. Ms. Finch has presented no evidence that Transite came in this form, and MNRM's uncontradicted evidence is that Transite platen insulators were a "hard solid flat plate," not a "fluffy type insulation," Doc. 289-3 at 11, that was "natural gray" in color. Doc. 321-7 at 20. MNRM cannot be liable for harm caused by exposure to platen insulators it did not sell.

---

set for summary judgment briefs. *See* LR 7.3(d). Moreover, she has not directed the Court's attention to the places in those briefs that address issues relevant to MNRM's motion, and "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991).

11

Finally, the plaintiff contends that Mr. Finch was exposed to asbestos because MNRM's Transite platen insulators were breaking up and releasing dust. She offers evidence that the original McNeil Ohio platen insulators were "breaking up" on the majority of the tire plant's presses by 1975. Doc. 307-35 at 3. She also shows that the Transite platen insulators at a different tire plant were "breaking up badly" in 1984. Doc. 307-36 at 2. This vague and unclear evidence, which either relates to insulators that another entity sold or to insulators at another plant, is insufficient to establish that the Transite insulators MNRM sold to the Firestone plant in Wilson "broke down" to such a degree that Mr. Finch was regularly exposed to asbestos from the insulators. *See Lohrmann*, 782 F.2d at 1162 (putting forth the frequency, regularity, proximity standard).

The plaintiff has not shown that Mr. Finch was frequently, regularly, and proximately exposed to asbestos fibers from asbestos-containing platen insulators that MNRM sold. Her evidence is insufficient to support an inference that these platen insulators caused harm to Mr. Finch.

**B.  Gear Reducers**

MNRM sold seven gear reducer units to the tire plant in 1980 and 1981 that contained asbestos in the Stearns brakes that were part of the units. Doc. 289-4 at 62; Doc. 307-8 at 12 (noting that the friction discs in all Stearns brakes contained asbestos until 1986). The mere presence of asbestos in these particular gear reducers, however, is not sufficient to establish exposure as to Mr. Finch. *See Andrews*, 2015 WL 12831332, at *2 (noting that the "mere presence of 'static asbestos' does not equate to asbestos exposure"). There is zero evidence that Mr. Finch worked on or in close proximity to

these gear reducers, which were located in the unloaders behind the press, not in the area of the press where Mr. Finch worked. Nor is there evidence that mechanics ever sanded down or used compressed air on the gear reducer for an unloader, much less that they did so in proximity to Mr. Finch. All of Ms. Finch's evidence bears on the loaders and tire presses.

Moreover, the very small number of gear reducers—seven—that MNRM supplied goes against finding frequent and regular exposure. The record shows that each press could cure two tires simultaneously, Doc. 289-9 at 5, meaning that there would be two unloaders per tire press. Because there were 150 tire presses in 1980, Doc. 307-2 at 12, and not accounting for replacement, this means that MNRM supplied only seven of the 300 gear reducers—or about 2.3 percent—that would have been in the curing room at a particular point in time. Even if Mr. Finch did work regularly in proximity to unloaders, there is no evidence that he worked around the particular unloaders that contained the seven gear reducers that MNRM supplied. *See Lohrmann*, 782 F.2d at 1163 (exposure to asbestos source 10 to 15 times over the course of the plaintiff's career held to be insufficiently frequent or regular as a matter of law); *see also Wilder v. Amatex Corp.*, 314 N.C. 550, 553–54, 336 S.E.2d 66, 68 (1985) (finding that "at trial plaintiff's evidence must demonstrate that he was actually exposed to the alleged offending products").

No reasonable jury could find that Mr. Finch was exposed to asbestos-dust from MNRM's gear reducers with the requisite frequency, regularity, or proximity to support an inference of causation. Even if the required degree of frequency, regularity, and proximity is lower in a mesothelioma case, the Court finds no support for the view that

North Carolina courts would allow an inference of causation to be drawn from such a small possible exposure.

   C.   **Gaskets**

The plaintiff appears to contend that Mr. Finch was exposed to MNRM's asbestos-containing gaskets during maintenance. As to the copper-asbestos gaskets, MNRM proffers undisputed evidence that the asbestos-material was encapsulated so that there was "virtually no release of [ ] asbestos fibers."[10] Doc. 289-12 at 11; *see also* Doc. 289-3 at 9–10. MNRM also offered evidence that these gaskets were easily removed and would not have required the scraping that Ms. Finch contends caused the release of asbestos fibers. Doc. 289-3 at 10. This evidence was put forward in MNRM's initial brief in support of summary judgment, and Ms. Finch did not address it in her response brief, much less offer conflicting evidence.[11]

Even putting aside MNRM's evidence concerning the encapsulation of the asbestos fibers in its gaskets, the plaintiff has pointed to no evidence that Mr. Finch was regularly exposed to asbestos from MNRM's gaskets. Mr. Singleton, a maintenance contractor, said that maintenance work on the gaskets in the curing room was "infrequent" and occurred only when there was an emergency call. Doc. 289-15 at 3–4.

---

[10] Although there is a double negative in the expert's testimony, the meaning is clear. Doc. 289-12 at 11. In the next sentence, the expert testified that because of the copper encasement, the asbestos "would not be friable . . . it could never be friable." Doc. 289-12 at 11. *See* Friable, Oxford English Dictionary (2d ed. 1989) (defining "friable" as "[c]apable of being easily crumbled or reduced to powder; pulverizable, crumbly").

[11] Plaintiff first attempted to dispute the evidence at oral argument. This effort will be disregarded. *See* n. 8 *supra*.

And Mr. Finch testified that he never saw, handled, or in any way worked with the gaskets in the presses. *See, e.g.*, Doc. 307-1 at 13. While Mr. Finch testified he called a mechanic to a tire press he worked on from once a week to once a month, that mechanic was called to work on only the brakes and not the gaskets. *Id.* Additionally, MNRM proffers evidence—which Ms. Finch did not dispute—that it supplied only a small number of asbestos-containing gaskets to the tire plant compared to the total number of gaskets used there, Doc. 289-3 at 10, and that its gaskets were internal to the machine and not accessible to mold changers. *Id.* at 9.[12]

In short, the plaintiff has not shown that Mr. Finch was exposed to any asbestos dust or fibers originating from gaskets that MNRM supplied, much less that such exposure occurred with anything approaching frequency, regularity, or proximity. Ms. Finch has not presented evidence sufficient to give rise to a disputed question of material fact on causation.

### D. Aggregate Exposure

Even if one looks at all the alleged exposure from asbestos-containing MNRM parts, as is almost certainly appropriate, Ms. Finch has not met the *Lohrmann* test or even a reduced exposure test potentially applicable to mesothelioma cases. The seven gear reducer units MNRM sold represented a very small proportion of the gear reducers in the

---

[12] Ms. Finch did not cite any evidence concerning the manifold gaskets in her briefing and she did not mention these gaskets until oral argument. *See* n. 8 *supra*. In any event, Ms. Finch has not directed the Court's attention to any evidence that these gaskets were ever removed from a tire press, or if they were, that Mr. Finch was present when they were removed.

15

curing room at a particular time and there is no evidence that any maintenance was performed on the gear reducers, much less that Mr. Finch was in the area while such work was performed. MNRM advances undisputed evidence that the asbestos fibers in its copper-asbestos gaskets were encapsulated and that its Transite insulators were barely exposed and were treated so as to limit degradation. In short, on this evidence no rational jury could conclude that Mr. Finch's exposure to the platen insulators, gear reducers, and gaskets sold by MNRM resulted in sufficient asbestos fiber exposure to give rise to an inference that these components contributed meaningfully to cause his mesothelioma. *See Agner v. Daniel Intern. Corp.,* No 3:98-CV-220, 2007 WL 57769, at *4 (W.D.N.C. Jan. 5, 2007) (noting that the plaintiff must prove that the "defendant's asbestos-containing product was a substantial factor in causing his damages").

### E. Other Parts

There is no evidence that MNRM sold asbestos-containing heat shields, pipe insulation, tire presses, or brakes, excepting the seven gear reducers that contained Stearns brakes discussed *supra*, to the Wilson tire plant. MNRM cannot be liable for products that it did not supply or that did not contain asbestos.

As to the heat shields, MNRM produced evidence that its replacement heat shields did not contain asbestos. *E.g.*, Doc. 289-3 at 13. Ms. Finch did not address this evidence in her opposition brief and it is thus uncontroverted for purposes of this motion. *See Catalan*, 17 F. Supp. 3d at 525. Similarly, MNRM proffers evidence that none of the tire presses it sold to the tire plant contained asbestos. Doc. 289-3 at 9. Ms. Finch does not

dispute this evidence and did not contend that Mr. Finch was exposed to asbestos from an MNRM press.

For the pipe insulation, MNRM proffers evidence that it did not supply any pipe insulation to the Wilson tire plant. At oral argument, Ms. Finch conceded that "there are no records showing [sales of pipe insulation] to Firestone Wilson." Transcript of Oral Argument at 28, Finch v. BASF Catalysts LLC, No. 16-CV-1077 (July 30, 2018). Finally, there is no evidence that MNRM sold any replacement brakes or replacement brake parts, other than the seven gear reducers that had Stearns brakes. Doc. 321-4 at 3–4; Doc. 289-3 at 13–14.

Ms. Finch offers other circumstantial evidence that MNRM's products contained asbestos into the mid-1980s. *E.g.*, Doc. 307-5 at 29 (referencing Doc. 307-19) and Doc. 307-19 (indicating, in 1986, that MNRM was still trying to determine what asbestos products remained so that it could purge them from its warehouse); *see also* Doc. 289-3 at 5 (summarizing testimony of former MNRM engineer asserting that MNRN "began" substituting asbestos-free parts for asbestos-containing AC parts "prior to" 1982 and "likely" did not sell asbestos products after 1982, but "definitely not" after 1985). This non-specific evidence is insufficient to show that MNRM sold other asbestos-containing parts to the plant or that Mr. Finch was exposed to asbestos fibers from such parts.

### F. Spoliation

Without evidence to show that MNRM supplied asbestos-containing parts that resulted in frequent and proximate exposure to Mr. Finch, Ms. Finch seeks a spoliation adverse inference to stave off summary judgment. A party seeking such sanctions must

establish that the alleged spoliator had a duty to preserve evidence and that it thereafter destroyed relevant evidence. *Turner v. United States*, 736 F.3d 274, 281–82 (4th Cir. 2013).[13]

Ms. Finch's cursory spoliation argument has not met this burden. Simply saying that MNRM spoliated evidence does not make it so. Statements in a brief are not evidence. *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (holding jury was properly instructed that counsel's statements are not evidence); *Skyline Corp. v. NLRB,* 613 F.2d 1328, 1337 (5th Cir. 1980) ("Statements by counsel in briefs are not evidence."). Nor has she specifically directed the Court's attention to evidence that MNRM destroyed sales records.[14]

Even assuming that MNRM did destroy some records, Ms. Finch has not put forward any evidence that MNRM had a duty to retain these particular records at the time they were destroyed. The evidence that Ms. Finch cites, Doc. 307-14 and Doc. 307-23, show no more than a generalized concern about possible litigation and is not sufficient to trigger a company-wide duty to preserve evidence. *See Realnetworks, Inc. v. DVD Copy*

---

[13] To obtain an adverse inference based on spoliation of evidence, Ms. Finch must establish that: (1) MNRM had a duty to preserve the evidence; (2) MNRM destroyed evidence that would have been relevant to her claims; and (3) MNRM "willfully" destroyed the evidence. *Turner*, 736 F.3d at 281–82. As the moving party, Ms. Finch has the burden of proof. *Id.* at 282. "Spoliation is a rule of evidence" and the decision to impose sanctions for violations rests within the sound discretion of the trial court. *Id.* at 281.

[14] The only evidence Ms. Finch submits is a letter from a lawyer for MNRM's predecessor stating that "parts and service records prior to 1982 cannot be retrieved." Doc. 307-11. This is a far cry from establishing that MNRM or its predecessor affirmatively destroyed documents. And of course there are sales invoices in this case from before 1982, *see, e.g.*, Doc. 289-3 at 7–8, indicating that not all such documents were destroyed.

*Control Ass'n*, 264 F.R.D. 517, 526 (N.D. Cal. 2009) ("A general concern over litigation does not trigger a duty to preserve evidence."). Absent a duty to retain destroyed records, there can be no spoliation.

## IV. Motion to Strike

MNRM moves to strike Red Seal's Responses to Plaintiff's Deposition by Written Questions for violating this Court's scheduling order. Doc. 322. To the extent that the answers simply authenticate documents, the motion will be denied. The documents were used during depositions and MNRM has shown no prejudice.

Beyond this, MNRM's motion to strike will be granted. The Court's Amended Scheduling Order required that "[a]ll discovery must be completed by April 2, 2018." Doc. 144 at 1. Ms. Finch served defendant Red Seal a Deposition Upon Written Questions on April 4, 2018, two days after the discovery deadline. Red Seal did not respond until May 4, 2018, some 30 days after the close of discovery and two days after MNRM submitted its motion for summary judgment. Conducting a deposition after the discovery deadline contravened this Court's scheduling order. Doc. 48 (requiring that all "depositions . . . must be taken during the discovery period" absent Court approval). Ms. Finch did not move for an extension of the discovery deadline before—or after—serving the written questions on Red Seal. She has offered no reason for her violation of the Court's scheduling order. Striking this evidence is appropriate.[15]

---

[15] Even if this evidence were considered, it would not change the outcome of the pending motion.

## CONCLUSION

MNRM has put forth evidence that Mr. Finch was not regularly, frequently, or proximately exposed to asbestos from products sold by MNRM and thus that his mesothelioma could not have been caused by its negligence in selling these products. Ms. Finch has not put forward sufficient evidence to create a disputed question of material fact on exposure and causation. No reasonable jury could find that MNRM's products caused Mr. Finch's mesothelioma. Summary judgment in favor of MNRM is proper.

It is **ORDERED** that the defendant McNeil & NRM's motion to strike, Doc. 322, is **GRANTED**. It is **FURTHER ORDERED** that the defendant McNeil & NRM's motion for summary judgment, Doc. 288, is **GRANTED.**

This the 22nd day of August, 2018.

_____
UNITED STATES DISTRICT JUDGE