IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANN FINCH, Individually, and as Executrix of the Estate of Franklin Delenor Finch, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16-CV-1077 |
| COVIL CORPORATION, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Ann Finch sued Covil Corporation and others for the wrongful death of her late husband, Franklin Finch, who died from mesothelioma caused by exposure to asbestos. She resolved or dismissed her claims against all defendants but Covil, and the case was tried from October 1 through October 5, 2018. The Court charged the jury on North Carolina state law negligence and failure to warn claims. The jury found Covil liable on both counts and returned an award of $32.7 million in damages.

Covil asks the Court to set aside the jury verdict and grant it judgment as a matter of law, contending the plaintiff failed to present evidence sufficient to support the verdict on liability. In the alternative, Covil asks for a new trial based on the "cumulative effect" of purportedly erroneous evidentiary rulings and jury instructions, improper arguments by plaintiff's counsel to the jury, and the excessiveness of the jury's verdict. To the extent the Court denies its motion for a new trial on damages, Covil seeks remittitur.

The plaintiff presented a persuasive case on liability, proffering extensive direct and circumstantial evidence that Covil sold asbestos-containing products to the Firestone tire factory where Mr. Finch worked, at a time when it knew or should have known the products were dangerous to human health; that Covil did not provide pre- or post-sale warnings on or about its asbestos products; and that exposure to asbestos products sold by Covil was a proximate cause of Mr. Finch's fatal mesothelioma.

Covil's arguments about insufficiency of the evidence ignore evidence favorable to the plaintiff, and its assertions about evidentiary rulings mischaracterize the record. It contends the jury instructions failed to address the frequency, regularity, and proximity of Mr. Finch's exposure to Covil's asbestos, but the instructions covered those factors as tailored to the evidence at trial. The plaintiff's closing arguments were grounded in the evidence, relevant, and not unfairly prejudicial, and nothing suggests that the jury's decision on liability was based on improper factors rather than a rational assessment of the strength of the plaintiff's evidence and the weakness of Covil's defense.[1] There is no reason to set aside the verdict on liability or to give Covil another bite of the apple.

As to damages, the plaintiff presented an equally compelling case. Her evidence was uncontroverted that mesothelioma is incurable and is one of the most painful forms

---

[1] Here and elsewhere in the opinion, the Court has stated the evidence in the light most favorable to the plaintiff, the prevailing party. *Int'l Ground Transp., Inc. v. Mayor of Ocean City, Md.*, 475 F.3d 214, 218–19 (4th Cir. 2007) (citing *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)). For efficiency and to avoid repetition, the Court has commented on the strength and persuasiveness of various aspects of the plaintiff's evidence, as that is appropriate in evaluating Covil's motion for a new trial. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

of cancer; that after his diagnosis, Mr. Finch experienced eight months of debilitating pain, suffering, and embarrassment; and that Mr. Finch went through hospitalizations, surgeries, complications, a colostomy, and time in a nursing home before he died. Covil made no effort to undermine the plaintiff's evidence of the close relationships between Mr. Finch and his family, and the jury had plenary evidence to conclude that the loss of companionship to Mr. Finch's wife and adult children had substantial value.

Though Covil did not emerge from this trial looking like a model corporate citizen and plaintiff's counsel did not pull any punches in her arguments that Covil should be held responsible for the harm caused by its negligence, the law does not require a plaintiff with the burden of proof to downplay the strength of her evidence or to sugarcoat the conduct of the defendant. The plaintiff's arguments were supported by the evidence, and Covil had a full and fair opportunity to challenge those arguments on the merits. The fact that Covil lost and the jury returned a large verdict is explained by the evidence, not by passion or prejudice.

The Court declines to substitute its judgment about an appropriate amount of damages for Mr. Finch's pain and suffering and the value of his companionship to his widow and three adult children for the reasoned judgment of the jury, as reflected in their unanimous verdict. Covil's motions will be denied.

## I.    Background

Firestone built a tire manufacturing plant in Wilson, North Carolina, from 1973 to 1974. PTX 13 at 566-1; Doc. 499 at 124:7–10. Mr. Finch worked in the plant from 1975 until 1995, nearly all of which time he spent as a mold changer in the curing room. Doc.

497 at 131:4–132:4. On a daily basis, Mr. Finch worked on and around the tire presses in the curing room and the insulated steam pipes leading to and from the presses.[2] *Id.* at 140:14–150:23; Doc. 498 at 10:9–14:24, 144:14–146:16; Doc. 499 at 13:22–14:1

It was undisputed at trial that Covil sold virtually all of the insulation, including pipe insulation, used during construction of the Firestone plant, Doc. 499 at 124:7–10, 125:7–18; PTX 13 at 566-6, and Covil's Rule 30(b)(6) witness,[3] James Covil, testified via deposition that at least some of this insulation contained asbestos. Doc. 499 at 110:13–17, 126:17–127:4. In 1975, the EPA banned installation of asbestos-containing pipe insulation, so that any insulation installed or replaced after that date would not likely have contained asbestos. Doc. 498 at 126:13–127:7, 155:13–21. Over 7,000 feet of asbestos-containing pipe insulation remained in the plant 15 years after construction, when it was removed during an abatement project. *Id.* at 156:10–14; PTX 5.

Covil did not produce any sales records showing how much, if any, of the pipe insulation it sold to Firestone was asbestos-free, contending the records were destroyed in a fire at its warehouse in 1973. Doc. 499 at 117:4–16. However, records obtained from Firestone included one 1974 invoice from Covil for 711 feet of "Thermobestos," PTX 4,

---

[2] Most of the steam pipes in the curing room were wrapped in insulation, Doc. 498 at 232:16–21, and the pipe insulation was often referred to at trial as "pipe covering," Doc. 497 at 115:19; Doc. 498 at 72:13, or "pipe lagging." Doc. 498 at 156:5–7.

[3] "The [30(b)(6)] designee, in essence, represents the corporation just as an individual represents him or herself at a deposition." *Universal Furniture Int'l, Inc. v. Frankel*, 835 F. Supp. 2d 35, 41 (M.D.N.C. 2011) (quoting *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (Mag. J., Order), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996)).

an asbestos-containing pipe insulation product.[4]  A Firestone receipt showed other insulation supplied by Covil—which the jury could have concluded contained asbestos[5]––was earmarked for use in the "curing area" where Mr. Finch worked.  PTX 21 at 593.

Mr. Finch was healthy when he retired in 1996, and he ran a small lawn care business for many years thereafter.  Doc. 498 at 193:11–194:15, 198: 7–11.  He had three adult children who lived nearby, and he was actively present in their lives.  Doc. 497 at 128:24–129:21.  After his first wife died in 2009, Doc. 500 at 32:13–18, Mr. Finch remarried the plaintiff here, Ann Finch, in 2013, Doc. 497 at 128:1–4, and the evidence is undisputed that he was a loving and caring husband.  *See, e.g.*, Doc. 500 at 40:24–41:3, 45:11-14.  He was 78 years old when he was diagnosed with mesothelioma, and Mr. Finch was "unusually healthy" for his age up to that point.  Doc. 498 at 157:20–25.

Mesothelioma is a cancer that starts out in the layer of cells lining the lung or abdomen, *id.* at 93:18–94:1, 97:1–18, 100:20–101:12, and there is no dispute the disease is caused by inhaling asbestos fibers, which over time can result in cancerous tumors.  *See, e.g.*, Doc. 499 at 33:4–15, 50:24–51:10, 59:20–62:17.  This process typically takes several decades, meaning a tumor does not develop until many years after a person is exposed.  *Id.* at 50:18–23, 59:20–24, 63:5–15.

---

[4] According to Ms. Finch's expert witness Dr. Edwin Holstein, Thermobestos "is preformed pipe covering or sometimes called half-rounds.  It was calcium silicate and then it had about 10 percent amosite asbestos in it."  Doc. 498 at 147:1–7.

[5] The receipt was for hundreds of feet of "Kaylo" pipe insulation, PTX 21 at 593, which was a brand name for insulation made with calcium silicate.  Doc. 498 at 28:4–7.  Some Kaylo was manufactured with asbestos.  *Id.* at 148:8–149:2, 176:19–20; Doc. 499 at 161:14–21.

Mesothelioma is one of the most painful cancers because of the number of nerve endings in the lining around the lungs, Doc. 498 at 98:2–17, and there is no cure for the disease. *Id.* at 83:3–8. Mr. Finch died approximately 10 months after his diagnosis. *Id.* at 35:3–12, 165:5–6.

The Court will address other facts as needed.

## II. Covil's Motion for Judgment as a Matter of Law under Rule 50(b)

Covil asks the Court to set aside the jury's verdict and enter judgment as a matter of law in its favor. Covil makes three arguments in support of its request. First, Covil contends Ms. Finch "failed to produce evidence that asbestos-containing pipe insulation provided by Covil was actually present in the Firestone plant." Doc. 505 at 5. Second, Covil asserts there was insufficient evidence that Mr. Finch was exposed to asbestos-containing products supplied by Covil, or of the "actual amount" of his exposure. *Id.* at 6–7. Finally, Covil maintains the evidence at trial shows that "any insulation products supplied by Covil that contained asbestos would have contained a warning as mandated by law," and that "there was no evidence presented that an alternate warning would have had any effect." *Id.* at 5.

After the jury has returned a verdict for the plaintiff, a court may only grant judgment as a matter of law for the defendant "if, viewing the evidence in a light most favorable to the [plaintiff] (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Int'l Ground Transp.*, 475 F.3d at

218–19.[6] Here, Covil's assertions go to the strength of the evidence, not its sufficiency. Those contentions were rejected by the jury, and judgment as matter of law is not appropriate. *See Cline*, 144 F.3d 294, 301 (4th Cir. 1998) (noting that, unlike a motion for a new trial, it is not proper to weigh the evidence in resolving a motion for judgment as a matter of law, and the inquiry is limited to assessing legal sufficiency).

### A. Presence of Asbestos Provided by Covil in the Firestone Plant

Ms. Finch presented more than sufficient evidence from which the jury could conclude that Covil supplied thousands of feet of asbestos-containing pipe insulation used in constructing the Firestone plant. Indeed, it was virtually undisputed that Covil sold all of the insulation used during the construction of the plant, Doc. 499 at 124:7–10, 125:7–21, that it was unlikely any asbestos-containing insulation had been added to the plant after its construction, Doc. 498 at 126:20–127:7, 155:13–21, and that, nearly 15 years later, over 7,000 feet of asbestos-containing pipe insulation was removed during an abatement project at the plant. *Id.* at 156:10–14; PTX 5.

Specifically, the plaintiff presented deposition testimony from Covil's Rule 30(b)(6) witness that Covil was the exclusive supplier of insulation to the Firestone plant during construction between 1973 and 1974 and that Covil supplied "miles of insulation," including pipe insulation, to Firestone. *See, e.g.*, Doc. 499 at 110:13–17, 124:7–10, 125:7–21. This witness also testified that Covil "supplied material for the plant, but everything did not have asbestos on it," *id.* at 126:17–127:14, thus admitting that at least

---

[6] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

some of this insulation contained asbestos. A Covil invoice showed the company shipped 711 feet of Thermobestos to the plant on a specific occasion in 1974, PTX 4; Doc. 499 at 124:12–125:4, and a Covil shipping order form listed other asbestos-containing insulation products as purchase options as late as 1982. PTX 1.

There were over 100 tire presses in the curing room of the Firestone plant. Doc. 497 at 136:23–137:15; Doc. 498 at 143:16–144:4. Each press had eight to ten external pipes, and most were wrapped with asbestos-containing insulation. *See, e.g.*, Doc. 498 at 15:7–15, 144:14–147:12, 232:16–24; Doc. 499 at 13:22–14:1. Evidence from Firestone established that "all of the asbestos insulation" used in the plant during construction was supplied by Covil, with the exceptions of insulation material sold with equipment like a tire press and "a single job involving only six tire presses." Doc. 498 at 153:18–154:6; PTX 13 at 566–6.

In 1990, 7437 feet of asbestos-containing material or pipe insulation was removed from the press area. Doc. 498 at 156:10-14; PTX 5. When asked "why there could be so much asbestos-containing insulation was removed if Covil only installed asbestos-free insulation," Covil's 30(b)(6) witness testified "I have no idea.". Doc. 499 at 130:23 - 131:1.

Nor did Covil present any sales records to rebut the inference that the insulation it sold to Firestone contained asbestos. *See* Doc. 499 at 111:1–11, 115:4. Its 30(b)(6) witness testified that Covil's sales records "relating to Firestone" were "pretty much wiped out" in a fire at Covil's Greenville warehouse in May 1974, *id.* at 115:2–9, though after being shown some documents by plaintiff's counsel, he corrected the date of the fire

8

to May 1973.  *Id.* at 116:23–117:16.  However, the plaintiff produced receipts showing that Covil supplied insulation to Firestone in 1974, *see* PTX 4, 20, and the witness confirmed that the company continued supplying insulation to Firestone into 1974.  Doc. 499 at 124:7–10.  Neither this witness nor any other evidence explained how a fire in May of 1973 destroyed documents from sales made after that date, *see, e.g.*, *id.* at 117:19–24, or why documents from other Covil warehouses in Wilson and Greensboro, which also supplied materials to Firestone, *id.* at 120:21–121:1, were not available.

Dr. Holstein testified that the EPA banned the installation of asbestos-containing pipe covering in 1975.  Doc. 498 at 126:20–127:7, 155:13–21.  Another witness, Charles Ay, testified that repairs or replacements to insulation after the asbestos ban went into effect would have likely used asbestos-free alternatives.  Doc. 499 at 178:5–24.

Over the years, mechanics and mold changers removed old pipe insulation as part of repairs and maintenance.  *Id.* at 6:2–17, 167:12–168:1; Doc. 498 at 20:18–21:1, 150:6–152:12.  Despite this removal and replacement, 7,437 feet of asbestos-containing pipe insulation connected to 67 tire presses remained in 1990, when it was removed during an asbestos-abatement project.  PTX 5; Doc. 498 at 156:10–14; Doc. 499 at 126:17–22.

This evidence was easily sufficient to allow the jury to conclude that during construction of the Firestone plant, Covil sold asbestos-containing pipe insulation for use in the tire curing area.  The evidence is also sufficient to support the inference that all or most of the asbestos-containing pipe insulation removed in 1990, plus much that had been removed during repairs and maintenance before that date, came from Covil.

Covil highlights several composition tests conducted on insulation from the plant that showed asbestos concentrations inconsistent with the asbestos-containing pipe covering products allegedly supplied by Covil—Kaylo[7] and Thermobestos. *See* Doc. 505 at 5–6 (citing Doc. 499 at 201:21–204:14, 204:25–206:9, 206:17–207:8, 211:9–215:4 (noting the tested materials were taken from curing presses, curing press "platens" and curing press "trenches")). However, there was a dispute as to whether these tests used insulation from inside the tire presses, *see* Doc. 497 at 143:2–144:3; Doc. 498 at 170:19–171:7, 225:12–19 (noting the platens were part of the presses), which Ms. Finch never contended was supplied by Covil,[8] Doc. 507 at 15, or insulation from outside the presses. *See, e.g.*, PTX 13 at 566–6 (Firestone's confirmation that Covil supplied virtually all insulation that was not sold with equipment). Even assuming it came from outside the presses, Covil sold several types of insulation to the plant other than Thermobestos and Kaylo. *See, e.g.*, DTX 13. Based on this and other evidence, *see* PTX 1, the jury could have reasonably concluded that the tested asbestos was supplied by Covil.

## B. Exposure to Covil's Asbestos

Ms. Finch also presented sufficient evidence that Mr. Finch was exposed to asbestos in products sold by Covil to a sufficient degree to cause his mesothelioma.

---

[7] *See supra* note 5.

[8] It was undisputed that Mr. Finch was also exposed to asbestos-containing insulation inside the tire presses supplied by another entity, and Ms. Finch and her expert agreed that this exposure was also a proximate cause of Mr. Finch's mesothelioma. Doc. 498 at 157:1–8; Doc. 501 at 95:23–96:1. The dispute was over whether Mr. Finch's exposure to Covil's asbestos outside the tire presses was also a proximate cause.

Mr. Finch worked at the Firestone factory for about 20 years beginning in 1975, and he spent nearly all of his time as a mold changer in the curing room. Doc. 497 at 131:4–132:4. His primary responsibility was to place molds into tire presses and remove them after they had been cured into the shape of a tire. *Id.* at 140:14–150:21. As noted *supra*, there was plenary evidence to prove that the external pipes connected to almost all of the presses were covered with asbestos-containing insulation supplied by Covil when the plant was built, and Mr. Finch began working there barely a year later.

Mr. Finch worked in close proximity to the insulated pipes connected to the tire presses. He often walked on or bumped into the pipe insulation, causing it to release dust. Doc. 498 at 147:23–148:7, 149:14–150:1; Doc. 500 at 9:9–10:6; *see also* Doc. 498 at 147:13–22. Steam leaks or other problems with the pipes were common, Doc. 499 at 6:2–12, 167:12–168:1; Doc. 500 at 57:21–58:1, and mechanics or mold changers would fix these issues by removing the insulation, performing repairs, and reinsulating the pipes, then cleaning up any debris around the tire molds using compressed air.[9] Doc. 498 at 19:23–23:12, 150:4–151:24; Doc. 500 at 59:12–60:25. This was a "very dusty process" that caused "air concentrations of asbestos" to rise "very high." Doc. 498 at 151:7–24; *see also* Doc. 499 at 168:9–13, 174:7–20. "Daily" for almost 20 years, Mr.

---

[9] Covil contends Mr. Finch's testimony that mechanics used compressed air was "limited to work with the molds on the tire presses, and was not related to any work on the pipe covering." Doc. 510 at 3 n.1. But Mr. Finch testified that mechanics would work on "steam leak[s]" and clean up debris with an "air-hose" if they got anything in or around the tire molds. Doc. 498 at 20:18–21:16. Dr. Holstein's undisputed testimony was that, to fix steam leaks, the mechanics would have "to take the insulation off [the pipes] first," which would create asbestos dust. *Id.* at 150:13–151:24. The jury was not required to accept Covil's interpretation of the evidence.

Finch worked within ten feet of one of these mechanics, for minutes to hours each day. Doc. 498 at 22:10–17; 150:4–17.

The plaintiff's medical expert, Dr. Holstein, testified without contradiction that Mr. Finch's mesothelioma was caused by asbestos exposure "beyond any reasonable doubt." *Id.* at 107:18–23. He also testified that Mr. Finch's exposure to asbestos in the pipe insulation—which the evidence shows was sold by Covil—was a "substantial factor" in causing his mesothelioma. *Id.* at 153:5–17.

Specifically, Dr. Holstein testified that Mr. Finch had "daily occasions for breathing the dust from [the pipe insulation], and over the course of time, this amounted to a substantial inhalation of asbestos." *Id.* at 152:10–12. Assuming Mr. Finch's sole exposure to asbestos was to the pipe covering on steam lines leading to the tire presses, Dr. Holstein testified that this would be "sufficient to cause malignant mesothelioma in human beings." *Id.* at 152:18–153:4. Assuming Mr. Finch's exposure to the pipe covering external to the tire presses was one of multiple exposures, including exposure to asbestos inside the tire presses not provided by Covil, *id.* at 153:18–154:17, 157:6–13, Dr. Holstein concluded that exposure to the external pipe insulation would nonetheless be a "substantial factor" in the development of Mr. Finch's mesothelioma. *Id.* at 153:5–17. Dr. Holstein highlighted several epidemiological studies on workplace exposure to asbestos that informed his opinion about the cause of Mr. Finch's mesothelioma, *id.* at 59:16–61:12, including studies specifically on tire factory workers. *Id.* at 61:13–16.

This evidence was more than sufficient to support the jury's finding that Mr. Finch was exposed to asbestos-containing products supplied by Covil to a sufficient degree to cause his mesothelioma, and that this exposure was a proximate cause of his disease.

Covil next asserts that "[t]here was no evidence regarding where in the gigantic Firestone plant this pipe insulation was installed." Doc. 505 at 6. This is inaccurate. Covil's 30(b)(6) witness admitted that Covil was the exclusive supplier of insulation to Firestone, Doc. 499 at 125:7–21, and the evidence was undisputed that Mr. Finch worked close to and frequently came into contact with pipe insulation outside the tire presses. As discussed in Section II.A, *supra*, there was substantial evidence that this pipe insulation contained asbestos. Moreover, Ms. Finch introduced into evidence a receipt showing that hundreds of feet of Kaylo insulation supplied by Covil were earmarked for use in the "curing area" where Mr. Finch worked. *See supra* Section I. The jury could reasonably conclude that this and other insulation contained asbestos, was supplied by Covil, and was present on or around the presses, in Mr. Finch's immediate work area.

Finally, Covil maintains Ms. Finch "failed to produce any evidence of any actual amount of decedent's exposure to asbestos from products supplied by Covil," and specifically, that her "experts failed to present any individualized analysis of the level of exposure to decedent from products attributable to Covil." Doc. 505 at 6–7. As such, Covil contends she failed to adduce sufficient evidence of causation. *Id.* at 7.[10]

_____

[10] Covil does not dispute that Ms. Finch's experts provided a "reliable determination of the level of exposure [to asbestos] necessary to cause" mesothelioma. *See Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 742 (E.D. Va. 2012), *aff'd*, 533 Fed. App'x. 192 (4th Cir. 2013); *see*

First, Covil misstates the applicable test. Although Ms. Finch was required to show that Mr. Finch's "actual level of exposure" to Covil's asbestos was sufficient to cause his mesothelioma, she was not required to quantify the "actual amount" of his exposure through an "individualized analysis," as Covil contends.

> [O]nly rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes. . . . [I]t is usually difficult, if not impossible, to quantify the amount of exposure. Consequently, while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263–64 (4th Cir. 1999) (failure to warn claim under South Carolina law); *see also Zellars*, 895 F. Supp. 2d at 739–42 (applying same standard to claim under Virginia law ); *Yates v. Ford Motor Co.*, 5:12-CV-752-FL, 2015 WL 3463559, at *2 (E.D.N.C. May 30, 2015) (same under North Carolina law).

Second, Covil inaccurately characterizes the record. As previously discussed in this section, the evidence showed Mr. Finch was exposed to asbestos-containing pipe insulation provided by Covil on a regular basis for many years, both as a bystander and through direct contact. Dr. Holstein testified that Mr. Finch's exposure to Covil's asbestos pipe insulation was at a level sufficient to cause his mesothelioma and was a substantial factor regardless of whether it was his sole exposure to asbestos or one of

---

*also infra* Section III.A.3 (discussing the testimony of the plaintiff's expert Dr. Arnold Brody about the biological processes whereby asbestos fibers enter the body and cause mesothelioma). Rather, Covil contends Ms. Finch failed to show that Mr. Finch was exposed to asbestos in Covil's products at that level. *See* Doc. 505 at 6–8.

multiple exposures to different sources. Doc. 498 at 152:18–157:13. Dr. Arnold Brody, Ms. Finch's expert on cell biology and the experimental pathology of asbestos-related diseases, Doc. 499 at 30:24–31:5, testified that exposure of the degree and duration that Mr. Finch was likely exposed to Covil's asbestos was sufficient to cause his mesothelioma. *Id.* at 64:4–12.

There is no dispute in this case that Mr. Finch's mesothelioma was caused by exposure to asbestos; Ms. Finch's experts so testified, and Covil neither introduced evidence to the contrary nor argued to the contrary at trial. Moreover, Covil did not proffer expert testimony at trial on the issue of causation or otherwise. Covil presented its contentions about the plaintiff's evidence of exposure and causation to the jury, *see, e.g.*, Doc. 501 at 80–81, which was not required to accept Covil's inferences or arguments in the face of contrary evidence from the plaintiff.

### C. Evidence on Failure to Warn Claim

Ms. Finch proffered more than sufficient evidence to allow the jury to find that Covil unreasonably failed to provide a warning on its asbestos-containing products and that this failure proximately caused Mr. Finch's mesothelioma.

Covil's 30(b)(6) witness testified that the company had information by the mid- to late-1960's that asbestos was hazardous and caused mesothelioma. Doc. 497 at 106:22–107:4, 118:4–8. Federal regulations were issued in 1971 explicitly stating that workplace asbestos exposure endangered the lives of employees. *Id.* at 119:5–24; Doc. 498 at 141:10–13. By 1972, the Occupational Safety and Health Administration required that companies selling asbestos-containing products, including asbestos pipe-covering like

that Covil sold to Firestone, provide a warning label stating that the product was hazardous to health. Doc. 498 at 141:14–142:18. The president of Covil had copies of these regulations. Doc. 497 at 119:25–120:2. This evidence was sufficient for the jury to find that Covil knew asbestos was dangerous by 1973, when it started selling asbestos-containing pipe insulation to Firestone. *See supra* Section II.A.

Of the Firestone workers whose testimony was offered at trial, the earliest any could remember being warned of the dangers of asbestos was the mid- to late-1980's, and those who were warned received their warning from Firestone, not from Covil. Doc. 498 at 138:6–17; Doc. 500 at 16:10–22, 61:3–23. Mr. Finch testified via deposition[11] that he was not informed of the dangers of asbestos until 2010 at the earliest, Doc. 498 at 192:17–24, years after his retirement from Firestone in 1995. Doc. 497 at 131:4–6. He also told the jury that he noticed warnings on several pieces of equipment in the Firestone plant, including a warning on the tire presses to "beware of moving parts," but that he did not see any warnings about "dangerous chemicals or solvents or material," or about asbestos specifically. Doc. 498 at 227:10–228:2; Doc. 499 at 10:17–25.

Covil's 30(b)(6) witness testified that he never saw any documents suggesting that Covil had developed a safety protocol for working with asbestos-containing insulation. Doc. 497 at 111:14–17. He also stated that the earliest document indicating any warnings were being given to anyone was from 1989, *id.* at 112:23–113:7, some fourteen years after Mr. Finch began working around the asbestos products Covil sold to Firestone.

---

[11] Mr. Finch was deposed after the lawsuit was filed. He passed away before trial, and the complaint was amended to add a wrongful death claim. *Compare* Doc. 1, *with* Doc. 150.

Covil has pointed to no direct evidence in the record that it provided asbestos warnings with any of the insulating products it sold to Firestone. Rather, it points to circumstantial evidence it contends shows that "the products supplied by Covil, *if they contained asbestos*, would have included a statutorily required warning." Doc. 505 at 2 (emphasis added). Covil highlights the testimony of Ms. Finch's expert, Mr. Ay, that OSHA regulations from the early 1970's required asbestos manufacturers to put a warning on the packaging of asbestos-containing materials. *Id.* at 5 (citing Doc. 499 at 187:4–9). This evidence is not strong enough to require a verdict in Covil's favor, especially since there was other evidence supporting a contrary inference.

Covil presented no witness or documentary evidence to show that Covil sold insulation packaged in compliance with these regulations. Covil's 30(b)(6) witness testified that the earliest document indicating any warnings were being given to anyone was from 1989. Doc. 497 at 112:23–113:7. Mr. Finch testified that Firestone conveyed warnings on other products in the plant, Doc. 498 at 227:13–228:2; Doc. 499 at 10:17–25, but neither he nor any other witness ever saw warnings on insulation. Because Firestone conveyed other warnings, the lack of any warning on insulation supports the inference that Covil never provided any warnings at the time of sale. Nor did Covil produce any evidence that it took any steps to convey appropriate warnings to Firestone, Mr. Finch, or other Firestone workers after the sale. *See Yates v. Ford Motor Co.*, No. 5:12–CV–752–FL, 2015 WL 2189774, at *4 (E.D.N.C. May 11, 2015) (collecting cases and suggesting North Carolina courts would likely impose a continuing, post-sale duty to warn on asbestos suppliers).

Covil next asserts that "there was no evidence presented that an alternative warning would have had any effect." Doc. 505 at 5. However, Covil ignores Mr. Finch's testimony that he followed the safety regulations at Firestone "as best as . . . it was possible for [him] to do," Doc. 498 at 190:3–9, and his recollection of specific warnings on equipment at the plant tends to support this. *Id.* at 227:10–228:2. The medical evidence was that "the more a person is exposed to [asbestos], the more likely it is that" it will cause mesothelioma. Doc. 499 at 63:21–25. This evidence was sufficient for the jury to conclude that Mr. Finch would have heeded warnings about the dangers of asbestos if Covil had provided them, and that a pre- or post-sale warning "could have been effective in preventing or alleviating" Mr. Finch's mesothelioma. *See Yates*, 2015 WL 2189774, at *4. Covil does not point to any countervailing evidence on this point in its briefing, and even if there was such evidence, the jury was not required to accept it.

Relatedly, Covil also appears to contend that alternate warnings (or any warnings at all) on its products would not have had any effect because "Firestone knew it had asbestos-containing materials in its plant and did nothing to warn its employees of any danger." Doc. 505 at 5; *see also* Doc. 510 at 2 ("The fact that the manufacturer's warning did not reach Mr. Finch was beyond Covil's control."). Covil seems to assume that Firestone's failure to convey warnings it received from others to Firestone employees would relieve Covil of liability. However, in North Carolina, the seller of a product generally does not discharge its duty to directly warn a reasonably foreseeable user or claimant by warning an intermediary such as Firestone, with one specific statutory exception that does not apply here. *See* N.C. Gen. Stat. § 99B-5(a), (c). North Carolina

does not appear to have adopted the "sophisticated user" defense, whereby a manufacturer is absolved of any duty to warn employees directly when a product is sold to an employer who is aware of its dangers.[12] *See Willis v. Raymark Indus., Inc.*, 905 F.2d 793, 796 (4th Cir. 1990).

The evidence was more than sufficient to support the jury's finding of liability on both Ms. Finch's negligence and failure to warn claims. Covil's counsel zealously advocated his client's position at trial, but Covil's evidence and inferences were not compelling, and a defense verdict was far from "the only conclusion a reasonable jury could reach." *Int'l Ground Transp.*, 475 F.3d at 218–19. Covil's motion for judgment as a matter of law under Rule 50(b) will be denied.

## III. Covil's Motion for a New Trial under Rule 59(a)

A court should grant a motion for a new trial only if the verdict is against the clear weight of the evidence, is based on evidence which is false, or will result in a miscarriage of justice. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). Unlike a motion for judgment as a matter of law, the district court may weigh evidence, assess credibility, and exercise its discretion in ruling on a motion for a new trial. *See,*

---

[12] Covil cites *Ziglar v. E. I. du Pont De Nemours & Co.*, 53 N.C. App. 147, 150–54, 280 S.E.2d 510, 513–15 (1981), and characterizes it as holding "that [a] retailer was not liable for [a] products liability claim involving the sale of an inherently dangerous toxic substance where it relied on warnings affixed by [the] manufacturer and the product was sold to a sophisticated user." Doc. 510 at 2. *Ziglar*, however, did not involve a sale to the user's employer, nor did it address whether a supplier could rely on an intermediary to convey warnings to ultimate users which the supplier did not provide to the intermediary.

*e.g.*, *Cline*, 144 F.3d at 301; *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994); *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir. 1985).

Covil does not contend there was any false evidence presented. It most directly appears to assert that upholding the verdict would result in a miscarriage of justice. *See* Doc. 505 at 8–19; *Wilhelm*, 773 F.2d at 1433 (quoting 11 Wright & Miller, Federal Practice & Procedure § 2805 at 38 (1973), for the proposition that the district court has a duty to order a new trial if required to prevent injustice).

Covil asks for a new trial on both liability and damages. In the alternative, it asks for a new trial on damages only, and to the extent the Court does not grant that request, Covil contends remittitur is appropriate.

## A. Liability

### 1. Evidentiary Rulings

If a court errs in admitting or excluding evidence and that error affects the "substantial rights" of a party, a new trial is appropriate. Fed. R. Civ. P. 61; *see also Phillips v. Morbark, Inc.*, 519 F. Supp. 2d 591, 594 (D.S.C. 2007) (noting a motion for a new trial should be denied "unless there were substantial errors in evidentiary rulings"). Covil challenges several of the Court's rulings.

The plaintiff offered into evidence deposition testimony from Covil's 30(b)(6) witness that he believed the company stopped selling asbestos-containing products in 1973. *See* Doc. 497 at 113:16–24, 115:20–24. Covil contends this evidence was irrelevant and impermissible character evidence and that the prejudice to Covil substantially outweighed its probative value.

20

However, this evidence was relevant to show that Covil sold asbestos-containing products at some point in 1973, when construction on the Firestone plant began. That is, by testifying that Covil stopped selling asbestos products at some point in 1973, the witness implicitly admitted that Covil sold asbestos products up to that point. This was particularly relevant because Covil's counsel had asserted in his opening statement that the manufacturer of Kaylo stopped including asbestos in that product in 1972, supporting his contention that the Kaylo that Covil supplied to Firestone from the manufacturer did not contain asbestos. *Id.* at 94:25–95:18. The plaintiff had the burden to prove that Covil sold asbestos-containing products used at the Firestone plant where Mr. Finch worked, and the 30(b)(6) testimony helped prove that Covil sold such products in 1973.

Evidence that Covil claimed to stop selling asbestos products around the time that asbestos became heavily regulated, *see supra* Section II.C, was also relevant to show that Covil had knowledge of the dangerousness of asbestos when it sold products to Firestone and was probative of whether Covil should have provided warnings then and later. Covil denied that it was negligent and denied it had a duty to warn, and this evidence was relevant to assessing Covil's duty of care and whether it breached that duty by selling asbestos at all or selling it without a warning—central elements of the plaintiff's case.

Covil contends the plaintiff used this testimony as improper character evidence because the plaintiff also introduced evidence that Covil continued to sell asbestos-containing products after 1973, and she highlighted the inconsistency to the jury. Doc. 505 at 9; *see also, e.g.*, PTX 4; Doc. 497 at 114:11–16; Doc. 501 at 32:2–15. But by offering testimony from Covil's Rule 30(b)(6) witness that Covil stopped selling asbestos

21

in 1973, the plaintiff was not bound by that evidence. She was entitled to show that this testimony was inconsistent with other evidence that Covil did, in fact, sell asbestos-containing products to Firestone after 1973, which was highly relevant to her case. It was not improper for the plaintiff to point out this inconsistency to convince the jury not to find this aspect of the 30(b)(6) testimony credible.

Such contrary evidence was particularly relevant in light of Covil's defense. The plaintiff presented an invoice showing Covil sold 711 feet of asbestos-containing insulation to the plant. *See supra* Section I. Covil conceded this sale at trial, Doc. 497 at 94:1–6, but it otherwise denied the insulation it sold contained asbestos, *id.* at 93:20–94:18, 94:25–95:18, contended there was no evidence of where the small amount of asbestos it supplied was installed, and asserted Mr. Finch's mesothelioma was solely caused by asbestos from other sources. *Id.* at 98:6–23. The plaintiff was allowed to rebut these contentions with other admissible evidence showing Covil sold more asbestos-containing pipe insulation than it was admitting and to attempt to persuade the jury in closing argument that Mr. Covil's testimony that Covil stopped selling asbestos products in 1973 was inaccurate. Plaintiff's counsel gave Mr. Covil an opportunity to address the contrary documentary evidence, which was substantial, and he failed to do so in any convincing way. *See, e.g.*, *id.* at 116:7–117:15; Doc. 499 at 130:23 -131:1. The fact that this evidence also made Covil "look bad" in some general sense does not make it inadmissible character evidence or unfairly prejudicial under Rule 403. It was highly relevant and its probative value outweighed the minimal possibility of unfair prejudice.

Covil also asserts that the "Court improperly forced [it] to stipulate to portions of Dwaine Waters' testimony." Doc. 505 at 10. This is not an accurate characterization of the record, which shows that the Court consistently deferred a final ruling so that it could make an appropriate Rule 403 evaluation and that Covil made a tactical decision to stipulate to part of Mr. Waters' testimony in order to keep out the most harmful aspects.

Mr. Waters was a Covil insulator in the 1970's. Doc. 499 at 144:15–17. He testified in a deposition that Covil supplied asbestos-containing Kaylo pipe insulation in boxes labeled "asbestos-free" to certain worksites other than Firestone around the time his daughter was born, Doc. 306-5 at 17–20 p. 527:6–536:3, which apparently was in 1977. Doc. 433 at 2 n.1 (citing Doc. 433-4).

To prevail at trial, Ms. Finch had to prove that Covil supplied asbestos-containing insulation to Firestone and that Mr. Finch was exposed to this insulation to a sufficient degree to cause his mesothelioma. *See supra* Section II.A–B. Mr. Waters' testimony was relevant for at least two reasons. First, it was relevant to the disputed issue of whether Covil sold asbestos without adequate warnings.[13] Second, if Covil was still selling asbestos pipe insulation in 1977, this made it more probable Covil was selling asbestos products when the Firestone plant was constructed in 1973 and 1974 and that the pipe insulation Covil supplied to the plant, in fact, contained asbestos. On the other hand,

---

[13] Indeed, Covil continues to maintain that testimony it elicited from Mr. Ay about OSHA regulations requiring manufacturers of asbestos-containing products to provide warnings shows that any "products supplied by Covil, *if they contained asbestos*, would have included a statutorily required warning." Doc. 505 at 2 (emphasis added), 5. Mr. Waters' testimony directly rebuts this contention and thus is relevant to Ms. Finch's failure to warn claim.

Mr. Waters' testimony raised concerns about unfair prejudice under Rule 403 because, as the Court explained at one point, "his testimony is not just that [Covil was] continuing to sell asbestos, it is that [Covil was] doing it in a deceptive manner," Doc. 499 at 70:8–19, and because its probative value was difficult to ascertain until Covil's defense took shape at trial. *See* Doc. 497 at 28:2–8 (noting it would be less relevant "if the defendant is not actually denying what the plaintiff is trying to rebut.").

The admissibility of Mr. Waters' testimony came up before trial when Covil sought to exclude the testimony in a motion in limine. Doc. 391 at ¶ 1; Doc. 394 at 1–3. The Court tentatively granted Covil's motion, but it noted that Mr. Waters' testimony might be admissible if Covil asserted in its opening statement or introduced evidence suggesting that it stopped using asbestos-containing products in 1973. Doc. 484 at 4–5. At this point, the plaintiff could not use Mr. Waters' testimony without bringing the matter to the Court's attention outside the presence of the jury. Doc. 484 at 1.

In opening statements, Covil's counsel did not contend that Covil stopped selling asbestos products in 1973. As noted *supra*, he admitted Covil sold 711 feet of Thermobestos to the Firestone plant, but he focused on the absence of documentary evidence showing where in the plant that insulation was used or showing that any other insulation sold by Covil contained asbestos. *See* Doc. 497 at 93:20–94:18 (noting as to the Kaylo that "there simply isn't any documentary evidence of yes, it did, no, it did not [contain asbestos]. There's no boxes."). Covil's counsel also asserted that the manufacturer of Kaylo stopped including asbestos in that product in 1972 and that much

of the Kaylo sold by Covil was delivered directly from the manufacturer, supporting Covil's contention that the Kaylo did not contain asbestos.  *Id.* at 94:25–95:18.

Thereafter, the admissibility of Mr. Waters' testimony came up twice again during the trial.  Neither time was in connection with a clear proffer by the plaintiff of his testimony, and each time the Court declined to issue a final ruling.  *Id.* at 26:17–25, 30:22–31:22; Doc. 499 at 79:8–12.  Its relevance was (and is) readily apparent given Covil's position on the lack of evidence in its opening statement, but the degree of relevance remained uncertain and the possibility of unfair prejudice to Covil was real, as the Court explicitly recognized.  Doc. 497 at 28:2–7; Doc. 499 at 70:8–19.  On the second such occasion, the Court stated "[a]s of right this second, I'm not going to let [Mr. Waters' testimony] in."  Doc. 499 at 82:1.  The Court unambiguously qualified that this was "not a final decision," *id.* at 81:13–82:2, and noted some of the ways the probative value of the testimony might outweigh its prejudicial effect, depending on Covil's evidence.  *Id.* at 79:5–12, 81:13–82:2.  At no time did the Court make any sort of final ruling admitting Mr. Waters' testimony, nor did it state that his testimony absolutely would be admissible in certain situations.

Shortly thereafter, Covil stipulated that Mr. Waters "testified that throughout the '70's and as late as 1977, Covil continued to sell some asbestos-containing Kaylo-type covering insulation."  Doc. 499 at 144:10–18; *see also id.* at 140:19–141:11.  As part of this stipulation, the plaintiff did not offer Mr. Waters' testimony that the asbestos-containing products were sold in boxes marked "asbestos-free."  Covil then continued to develop evidence to support its contention that the insulation it sold to Firestone largely

25

did not contain asbestos, including cross-examining the plaintiff's expert Mr. Ay about when the manufacturer stopped including asbestos in Kaylo.  *See id.* at 188:2–17; *see also id.* at 201:21–204:14, 204:25–206:11, 206:17–207:8, 211:9–215:4.

The Court never held, as Covil contends, "that Mr. Waters' testimony was otherwise admissible unless Covil stipulated."  Doc. 505 at 10.  Indeed, during the discussion shortly before Covil stipulated, the Court stated at least seven times that its leanings on the issue—*which at that point were favorable to Covil*—were tentative.  Doc. 499 at 78:18–24, 79:8–12, 80:4–5, 81:2–4, 81:13–17, 19–25, 82:1–2.  The Court refused to give Covil's counsel an advance ruling on admissibility.  *Id.* at 81:19–25 ("You're not entitled to evidentiary rulings in advance of my having a full and complete understanding of the relevance so that I can weigh that against the potential for unfair prejudice.  I'm just not going to rule right now.  You all have to proceed and the plaintiff can raise it again after Mr. Ay testifies, or whenever you want to raise it again.").[14]

---

[14] Courts routinely defer ruling on motions in limine and evidentiary matters until they have enough information.  *See, e.g.*, *Nickerson v. State Farm Mut. Auto. Ins. Co.*, No. 5:10CV105, 2011 WL 5192317, at *1 (N.D.W. Va. Oct. 31, 2011) (deferring a ruling on a motion in limine because the court was "unable to discern at this time the relevance" of the evidence); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, No. 2:10CV248, 2011 WL 7036048, at *2 (E.D. Va. July 5, 2011) (deferring a ruling on a motion in limine directed to evidence inconsistent with the court's claim construction ruling so that the court could "rule on this issue as it arises within the context of the trial"); *see also Humbert v. O'Malley*, No. WDQ-11-0440, 2015 WL 1569182, at *4 (D. Md. Apr. 6, 2015) (deferring ruling on motions in limine involving "questions of relevance and prejudice" which could not be resolved "outside of the context of trial.").  Courts are often better situated to assess the value and utility of evidence during trial. *See, e.g.*, *United States v. Verges*, No. 1:13CR222 (JCC), 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014) (collecting cases); *see also Luce v. United States*, 469 U.S. 38, 41 (1984) (noting that courts are "handicapped in any effort to rule on subtle evidentiary questions outside a factual context").

Covil chose to stipulate to Mr. Waters' testimony, apparently making the tactical decision that this would allow it to cross-examine Mr. Ay as it wished while preventing evidence about the deceptive labelling from coming before the jury. Covil may not recast its strategic decision as an error by the Court or as grounds for a new trial.

Finally, Covil contends the Court improperly excluded evidence that the company ceased all operations in 1991. Doc. 505 at 9–10. Neither in the transcript pages Covil cites nor elsewhere did the Court exclude any such evidence; the Court merely held that counsel for Covil could not mention in opening statements that the company closed in 1991 if it had no evidence to support it. Doc. 497 at 43:2–8, 44:8–15; *see also* Fed. R. Evid. 103(a) (requiring a "*ruling* to admit or exclude evidence" for a party to claim error (emphasis added)). The Court made no ruling to exclude evidence on this matter.

Indeed, the Court stated it did not "have any problem" with such evidence, Doc. 497 at 44:14–16, 23–24, which Covil intended to use to explain why it would not have a live corporate representative testify at trial. *Id.* at 42:12–18. The Court noted that "there would need to be a great deal of care taken" with such evidence because it might indicate to the jury that "there is nobody to hold responsible," *id.* at 44:14–19, and that it might open the door to normally inadmissible evidence to rebut this inference. *Id.* at 44:18–45:5. Covil apparently made a strategic decision not to offer this evidence. It cannot now blame the Court that the evidence was not before the jury.[15]

---

[15] Nor does Covil explain how it could not obtain a corporate representative to appear at trial yet it was able to hire counsel to represent it, file an answer, and appear for a Rule 30(b)(6) deposition. *See Dunkley v. Shoemate*, 350 N.C. 573, 577, 515 S.E.2d 442, 444 (1999) (holding

In any event, none of these claimed errors are grounds for a new trial. Ms. Finch's evidence on liability was not only adequate to support the verdict, it was substantial, credible, and persuasive. Covil's evidence, on the other hand, was not particularly persuasive, and its own corporate representative was unable to disagree with the plaintiff's strongest evidence that the pipe insulation Covil sold contained asbestos. *See supra* Section II.A–C (discussing the relevant evidence on liability). Covil never contended that asbestos was a safe product, much less offered evidence in support of that view, and it offered no expert testimony to undermine the plaintiff's evidence on causation. Even if the Court did err in admitting or excluding evidence, any such error was harmless and does not warrant a new trial. *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights"); *Caudle v. District of Columbia*, 707 F.3d 354, 361 (D.C. Cir. 2013) (noting that an error is harmless and a new trial is not required if "the case is not close"); *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 197 (4th Cir. 1982) (requiring courts to "take into account . . . the strength of the case (e.g. whether it is a close case)," among other factors, in determining whether to set aside a verdict), *rev'd en banc on other grounds*, 712 F.2d 899 (1983). The verdict on liability was consistent with, not contrary to, the clear weight of the evidence. *See Knussman v. Maryland*, 272 F.3d 625, 647 (4th Cir. 2001).

---

that "no person has the right to appear as another's attorney without the authority to do so, granted by the party for which he or she is appearing," and that the client "must exercise control over" the attorney).

## 2. Arguments and Statements by Counsel for the Plaintiff

Covil also contends it is entitled to a new trial because plaintiff's counsel made improper arguments to the jury. To obtain a new trial based on improper statements by counsel, there must be a "reasonable probability" that the argument improperly influenced the jury in reaching its verdict by effectively subverting the jury's reason or its commitment to decide the issues based on the evidence and the law. *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 351 (4th Cir. 2014); 12 Moore's Federal Practice § 59.13 [2][c][i][B] (3d ed. 2019). Courts routinely deny new trials if improper remarks by counsel, when placed in the broader context of trial and the evidence, did not likely influence the verdict. *See, e.g.*, *Minter*, 762 F.3d at 352; *Arnold*, 681 F.2d at 197–200.

The test is even more stringent when the party moving for a new trial did not object to the purportedly improper argument at trial. Courts will not grant a motion for a new trial where the moving party has failed to timely object unless "exceptional circumstances exist such as when the error is so obvious or so serious that the public reputation and integrity of the judicial proceeding is impaired." *Denis v. Gen. Elec. Corp.*, 762 F.2d 365, 367 (4th Cir. 1985).

Covil contends that it is entitled to a new trial because:

- "Plaintiff's counsel argued lost income from the decedent even though Plaintiff did not seek damages for the net income of the decedent." Doc. 505 at 11 (citing Doc. 501 at 70:20–23 and Doc. 497 at 68:16–21).

- "Plaintiff's counsel repeated[ly] stated personal beliefs about the veracity and import of the evidence despite being specifically instructed not to." *Id.* at 11 (citing Doc. 501 at 25:12–72:3, 90:10-97:3, and specifically, Doc. 501 at 44:24–25, 55:15–22, 58:16–17, 69:19).

- "Plaintiff's counsel grossly misrepresented the amount of Kaylo insulation supplied to the Firestone plant. Plaintiff's counsel argued that 50 miles of Kaylo insulation was provided to the plant, where the actual purchase orders and invoices show less than a tenth of this amount of calcium silicate pipe insulation." *Id.* at 11–12 (citing Doc. 501 at 27:13–18, 42:12–43:6, 45:10–16, 49:9–16; Doc. 497 at 85:12–20; Doc. 499 at 216:13–217:5).

- "Plaintiff's counsel claimed that Covil destroyed documents, which was not relevant, not in evidence, and contrary to this Court's prior ruling denying Plaintiff's request for spoliation sanctions." *Id.* at 12 (citing Doc. 501 at 58:16–59:16, 96:6–24).

- "Plaintiff's counsel portrayed Covil as disingenuous and attacked Covil as unwilling to show up in person to the trial, despite knowing that Covil has been out of business for more than two decades." *Id.* at 12 (citing Doc. 501 at 30:10–19, 32:24–35:18, 37:1–4, 39:25–40:1, 47:2–8, 48:18–24).

- "Plaintiff's counsel argued that all materials provided by Covil contained asbestos where there was no evidence concerning the asbestos content of any materials other than the pipe insulation." *Id.* at 12 (citing Doc. 501 at 42:12–43:23, 49:9–16, 51:24–52:15, 93:7–16).

- "Plaintiff's counsel misrepresented to the jury that decedent would be entitled to recover damages for each year of life he lost." *Id.* at 12 (citing Doc. 501 at 69:10–70:3).

The Court has repeated the sum total of Covil's arguments in its opening brief on these alleged errors. Such cursory arguments made virtually in passing do not warrant an extended discussion by the Court, which need not undertake the analysis and legal research needed to support or rebut perfunctory arguments. *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 460 (M.D.N.C. 2015); *Cathey v. Wake Forest Univ. Baptist Med. Ctr.*, 90 F. Supp. 3d 493, 509 (M.D.N.C. 2015); *see also* LR 7.2(a) (requiring litigants to refer to statutes, rules, and authorities in support of their arguments); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1320 n.3 (Fed. Cir. 2005) (refusing to address an undeveloped argument raised in a

footnote); *Hughes v. B/E Aerospace, Inc.*, No. 1:12–cv–717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

Moreover, with two exceptions, these arguments were made without objection by Covil. "It is the universal rule that during closing argument counsel cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." *Denis*, 762 F.2d at 366–67.

Covil did object to plaintiff's counsel's claim in closing argument that Covil "sold tons of other stuff" besides Kaylo and Thermobestos, the pipe insulation largely at issue in the trial, "including things that had varying different amounts of asbestos." Doc. 501 at 92:21–93:4. But this argument was supported by rational inferences from the evidence. Covil supplied all insulation used during construction of the Firestone plant, not just pipe insulation. *Supra* Section II.A–B; DTX 13. A 1982 order form showed Covil sold asbestos-containing insulation other than Thermobestos or Kaylo. *See* PTX 1 (listing "Asbestos Cloth" and "Asbestos Cement," among other asbestos-containing products), and tests of certain materials at the plant showed asbestos concentrations inconsistent with Thermobestos and Kaylo insulation. *Supra* Section II.A. This chain of evidence supports the inference that Covil sold other insulation to the plant with "varying different amounts of asbestos," and thus, the argument was not improper. Moreover, counsel did not assert, as Covil maintains, that "all materials provided by Covil contained asbestos." Doc. 505 at 12. Her argument was that, if asbestos insulation was in the plant

that was not supplied separately with equipment such as the tire presses, it likely came from Covil, even if it wasn't Thermobestos or Kaylo. *See, e.g.*, Doc. 501 at 92:12–93:24.

Covil also objected to counsel's argument that Covil destroyed sales records, asserting that there was no evidence to support it. However, as the Court ruled contemporaneously, this was a permissible inference from the evidence. *Id.* at 96:6–18. Covil said the records were destroyed in a fire, but neither Covil's 30(b)(6) witness nor any other witness or evidence explained how a fire in May of 1973 in Greenville could destroy documents from sales made after that date or from sales made from other warehouses. *See supra* Section II.A. The inference argued by counsel was relevant to show Covil's awareness of its negligence, to provide context for why the plaintiff had not proffered more robust documentary evidence, and to address Covil's contention that the absence of documentary evidence meant the plaintiff could not prove her case. Covil's contention that counsel's argument was inconsistent with a pre-trial ruling denying spoliation sanctions was not raised as part of Covil's objection at trial, *see* Doc. 501 at 96:15–16, and in any event mischaracterizes the record.[16]

---

[16] Covil does not direct the Court to the place in the record where it made such a ruling. *See* Doc. 505 at 12. In the Order the Court assumes Covil is referencing, Doc. 348, the Court granted summary judgment for Covil on the plaintiff's premises liability claim. *Id.* at 8. In connection with that claim, the Court rejected the plaintiff's "cursory" argument that the claim should go forward as a sanction for Covil's spoliation of evidence because the plaintiff had not supported her factual assertions about spoliation with evidentiary citations. *Id.* at 9–10. The Court did not prohibit the plaintiff from introducing evidence about, or directing the jury's attention to, evidence that Covil had not produced relevant sales records. Moreover, to obtain an adverse inference sanction based on spoliation, the burden was on Ms. Finch to show that Covil willfully destroyed relevant evidence it had a duty to preserve. *Id.* at 9 (citing *Turner v. United States*, 736 F.3d 274, 281–82 (4th Cir. 2013)). At trial, Ms. Finch was not seeking a sanction, and she

As to the remaining parts of plaintiff's closing arguments to which Covil did not object, Covil's belated complaints are also without merit, either because Covil's characterization of the argument is inaccurate, the arguments were not improper, or the argument could not rationally have caused prejudice to Covil. The Court need not address each such contention, and a few examples suffice.

While plaintiff's counsel did express personal opinions from time to time during closing arguments and during trial, *see, e.g.,* Doc. 501 at 44:21–25, 69:16–20, defense counsel occasionally did the same thing, *see* Doc. 499 at 188:10–16, and the Court repeatedly instructed the jury that the statements and opinions of the lawyers are not evidence. *See, e.g.*, Doc. 499 at 182:16–21; Doc. 501 at 24:14–22, 113:8–9, 114:20–115:2. "[J]uries are presumed to follow their instructions," *United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012), and there is nothing to otherwise indicate these stray remarks affected the verdict.

Covil contends that there was no evidence to support plaintiff's argument that Covil sold "50 miles" of Kaylo insulation to the plant. Doc. 505 at 11 (citing, e.g., Doc. 501 at 43:4–6).[17] Yet Covil's own Rule 30(b)(6) witness testified that Covil sold "miles"

---

was entitled to argue any reasonable inferences from the evidence. *See, e.g.*, *United States v. Miguel*, 338 F.3d 995, 1001 n.14 (9th Cir. 2003).

[17] Covil asserts that the purchase orders and invoices show Covil supplied less than a tenth of this amount of insulation to the Firestone plant, but it does not cite to those invoices or otherwise calculate the actual footage of Kaylo that the evidence shows Covil supplied. *See* Doc. 505 at 11; Doc. 510 at 8. The Court declines to scour the record on Covil's behalf in support of an argument Covil did not see fit to make at trial or to support with citations to evidence in its brief. *See Cray Commc'ns, Inc. v. Novatel Comp. Sys., Inc.*, 33 F.3d 390, 396 (4th Cir.1994) ("[The district court is] well within its discretion in refusing to ferret out the facts that counsel had not

of insulation to the Firestone plant. Doc. 499 at 124:7–10. Given Covil's concession, it is not "reasonably probable" that counsel's similar statement influenced the jury's verdict. *See* 12 Moore's Federal Practice § 59.13 [2][c][i][B].

Contrary to Covil's argument, plaintiff's counsel did not say that Covil was "disingenuous" for not providing a live witness, Doc. 505 at 12, or ask the jury to punish Covil for its absence; counsel simply pointed out that no one from Covil testified in support of defense counsel's arguments that Covil only sold a few hundred feet of asbestos-containing insulation to the Firestone plant or to explain other obvious inconsistencies and problems in Covil's theory of the case. *See, e.g.*, Doc. 501 at 35:1–12, 36:23–37:20, 46:20–47:8. It is proper for a party in a civil case to suggest inferences, based in evidence, from the failure of an adversary to present witnesses under its control. *See, e.g.*, *Mammoth Oil Co. v. United States*, 275 U.S. 13, 52 (1927) (holding in a civil case that the failure of the "principal representative" of a defendant corporation to testify "cannot properly be held to supply any fact not reasonably supported by the substantive evidence in the case, [though] it justly may be inferred that he was not in position to combat or explain away any fact or circumstance so supported by evidence and material to the . . . case"); *Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1229 (8th Cir. 1995) ("[T]here may be comment on the failure of a party to call an available witness whose testimony the party would naturally be expected to produce if favorable to him.").

---

bothered to excavate."); *Hughes*, 2014 WL 906220, at *1 n.1 ("A party should not expect a court to do the work that it elected not to do.").

And Covil has not cited any case for the proposition that it is improper for plaintiff's counsel to point out to the jury that the defendant did not attend the trial.

In its reply brief, Covil raised additional purported problems with the plaintiff's closing arguments. *See* Doc. 510 at 8.[18] First, a party "cannot allege new grounds for relief for the first time in his reply brief." *Castillo v. Perritt*, 142 F. Supp. 3d 415, 417 n.1 (M.D.N.C. 2015); *see also* LR 7.3(h). Among other problems, allowing novel arguments in a reply brief is unfair to the opposing party and risks "an improvident or ill-advised opinion on the legal issues raised." *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995). Second, Covil did not object at trial to any of the statements identified for the first time in its reply brief, making its current objection twice-belated. But even if the Court were to consider these objections on the merits, Covil has not shown "exceptional circumstances" or that "the error is so obvious or so serious that the public reputation and integrity of the judicial proceeding is impaired." *Denis*, 762 F.2d at 367.[19]

---

[18] Specifically, Covil's objections to counsel's purported statements in closing argument about Covil's size and net worth, its refusal to resolve the plaintiff's claims, that Covil was motivated by money and not morals, and that Covil kept people in the dark about the dangers of asbestos, Doc. 510 at 8, were not raised in Covil's opening brief. *See* Doc. 505.

[19] For example, counsel did not ask the jury to punish Covil due to its size or net worth; counsel mentioned Covil's "hundreds of employees" to provide context for Covil's decision to choose a 30(b)(6) deponent who had no decision-making responsibilities during the relevant time and to drive home that no one testified to support or explain inconsistencies in Covil's theory of the case. Doc. 501 at 32:24–35:13. Counsel mentioned Covil's sales totals in 1974 to draw a contrast with how little Covil spent on education and safety, which went to her failure to warn claim. *Id.* at 55:23–57:5. Counsel's statements suggesting Covil was motivated by "money and not morals" explained why Covil might have continued to sell a product it knew was dangerous as the industry was adopting safer substitutes. *Id.* at 55:4–9. Had Covil objected at trial to counsel's purportedly improper and somewhat indirect comment about the lack of a settlement in the case, *see id.* at 36:5–11, any such error could have been corrected then, and in any event, the

Finally, Covil has not shown that it was prejudiced by any of these closing arguments, whether counsel objected to them at trial or not. As noted in *supra* Section III.A.1, Ms. Finch proffered substantial, credible, and persuasive evidence of Covil's liability. Jim Covil, testifying as and on behalf of the company, admitted many of the most important facts. Given the strength of Ms. Finch's case, there is no prejudice to Covil. *See* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial"); *Arnold*, 681 F.2d 197 (noting the relevance of the "strength of the case" to the new trial inquiry). Indeed, the only prejudice Covil asserts is the size of the verdict. Doc. 505 at 12. That fact alone does not show prejudice. *See, e.g.*, *Clehm v. BAE Sys. Ordnance Sys. Inc.*, No. 7:16–cv–00012, 2018 WL 6594612, at *3 (W.D. Va. Dec. 14, 2018) (collecting cases).

Covil has not met its burden to show that any of counsel's arguments warrant a new trial on liability.

### 3. Jury Instructions

Covil also contends it is entitled to a new trial because of improper jury instructions. A new trial is appropriate based on jury instructions only if the jury instruction was erroneous and "there is a reasonable probability that the erroneous instruction affected the jury's verdict." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns,*

---

Court and counsel for the plaintiff told the jury on numerous occasions that the statements of counsel are not evidence. Doc. 497 at 3:24–4:5, 7:8–11; Doc. 499 at 182:16–20; Doc. 501 at 36:25, 95:2–4, 113:8–9, 114:20–115:2.

*Inc.*, 881 F.3d 293, 310 (4th Cir. 2018).  Covil has not shown any error in the Court's instructions, much less error that may have affected the verdict.

Covil first contends that the Court should not have submitted a general negligence issue to the jury at all because Ms. Finch only alleged a claim for negligence on a failure to warn theory in her complaint.  Doc. 505 at 13.  This is incorrect.  In her third amended complaint, Ms. Finch lists as her first cause of action, "Negligence," Doc. 150 at 13, and alleges Covil was negligent for, *inter alia*, "[c]ontinu[ing] to use a known cancer-causing product, to wit: asbestos."  *Id.* at ¶ 45(h).

Covil next contends that the Court's instructions on proximate causation were erroneous.  Doc. 505 at 13–14.  Covil asserts that the "frequency, regularity, and proximity test" stated in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986) set forth the proper jury instruction on causation, and that the Court's instruction differed from this test in a way that prejudiced Covil "by reducing Plaintiff's burden on causation."  Doc. 505 at 14.

In *Lohrmann*, the Fourth Circuit evaluated the sufficiency of the evidence on causation in an asbestosis case, 782 F.2d at 1161–63, and held:

> To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.  Such a rule is in keeping with the opinion of the plaintiff's medical expert who testified that even thirty days exposure, more or less, was insignificant as a causal factor in producing the plaintiff's disease.

*Id.* at 1162–63. In the present case, the Court in substance directed the jury to evaluate the frequency, regularity, and proximity of Mr. Finch's exposure to Covil's asbestos-containing products:

> In evaluating proximate cause, you're specifically evaluating, among other things, whether Mr. Finch was exposed to asbestos-containing insulation sold by Covil to such an extent that it is reasonable to infer and find by the greater weight of the evidence, that Covil's insulation was a substantial factor contributing to Mr. Finch's development of his mesothelioma. You will make this decision in light of all of the evidence, including, for example, medical and scientific evidence you find to be credible about the degree of exposure required to cause mesothelioma, whether the evidence establishes that degree of exposure from Covil products and any credible expert testimony on causation.
>
> You should consider how much Covil insulation was in the plant, what portion of that insulation contained asbestos, how closely Mr. Finch worked around the places where the Covil asbestos-containing insulation was, the amount of dust from Covil asbestos-containing insulation products, how long Mr. Finch worked in the plant and other relevant evidence about his exposure to asbestos-containing products sold by Covil.

Doc. 501 at 102:9–103:2. While the Court did not quote from *Lohrmann* or use the exact words requested by counsel, this instruction covered frequency, regularity, and proximity in substance and in a manner specific to the evidence in this case. *See Cunningham v. Springer*, 204 U.S. 647, 658 (1907) ("A judge is not bound to charge the jury in the exact words proposed to him by counsel. . . . If he [or she] instructs the jury correctly and in substance covers the relevant rules of law proposed to him by counsel, there is no error in refusing to adopt the exact words of the request.").

Moreover, *Lohrmann* established a sufficiency of the evidence standard in an asbestosis case, not a jury instruction for all future asbestos-related disease cases. *See Lohrmann*, 782 F.2d at 1162–63. And the court in *Lohrmann* stated the test in light of the

evidence in that case about asbestosis and the requisite level of exposure, evidence which was quite different from the evidence in this mesothelioma case.

Specifically, *Lohrmann* held that the frequency, regularity and proximity test was a "reasonable rule when one considers . . . the unusual nature of the asbestosis disease process, which can take years of exposure to produce the disease." *Id.* at 1162. It noted the test was "in keeping with the opinion of the plaintiff's medical expert who testified that even thirty days exposure . . . was insignificant as a causal factor in producing the" disease. *Id.* at 1163. It also found the test was reasonable in light of the size of the plaintiff's workplace. *Id.* at 1162. *Lohrmann* thus upheld a sufficiency of the evidence standard that was tailored to the specific disease at issue in the case, the medical testimony on the degree of exposure required to produce that disease, and the characteristics of the place where the plaintiff was exposed to asbestos that bore on causation of the disease.

To the extent the Court did not use *Lohrmann*'s exact language, the differences were warranted by differences between the diseases at issue and the evidence. The disease in this case was mesothelioma, not asbestosis, and the undisputed medical testimony demonstrated the significance of this distinction to assessing the level of exposure required to produce each disease. Dr. Holstein testified without contradiction that asbestosis "is characterized by scar[r]ing in the lungs" or the "pleura, which is the lining around the lung," due to inhaling asbestos. Doc. 498 at 87:14–20, 89:6–9. Asbestosis starts "at the bottom of the lungs, and with increasing severity, it can creep upwards to affect the upper parts of the lungs." *Id.* at 87:21–25. Dr. Holstein stated that

the characteristic scar tissue in asbestosis is "caused by the asbestos sitting [in the lung] for decades" and develops "gradual[ly] and very slow[ly]." *Id.* at 88:4–7. Dr. Holstein explicitly testified that asbestosis is "not cancer," *id.* at 89:6–7, and that it is neither necessary nor sufficient to cause mesothelioma. *Id.* at 94:14–95:6.

Mesothelioma, in contrast, is a "cancer that starts out in" the lining around the lung—the pleura—or, in Mr. Finch's case, in the "lining in the abdomen that is very similar to the pleural lining," called the peritoneum. *Id.* at 93:22–94:1, 97:1–18, 100:20–101:6. Dr. Arnold Brody, the plaintiff's expert on cell biology and the experimental pathology of asbestos-related diseases, Doc. 499 at 30:24–31:5, testified at length about the specific processes whereby inhaled asbestos fibers come into contact with cells on the pleura, causing them to become tumorous and develop into mesothelioma. *Id.* at 31:19–22, 33:4–15, 34:6–63:25. Specifically, he testified that asbestos fibers can cause DNA damage to mesothelial cells on the pleura. *Id.* at 60:1–12. Cells with DNA damage "typically die" but sometimes survive and pass down the defect through cell division and subdivision. *Id.* at 60:13–62:13. Although one DNA error is not sufficient to cause cancer, further asbestos exposure can cause additional errors in the damaged cells. *Id.* at 61:13–63:4. Scientists do not know how many, or which, DNA errors are required to cause cancer, but "the more [errors] you get, the more likely it is that cancer will develop." *Id.* at 62:14–23. This process typically takes several decades, meaning a tumor does not develop until many years after a person is exposed. *Id.* at 50:18–23, 59:23–24, 63:5–15. Dr. Brody testified that, while a "single [asbestos] fiber is not sufficient to cause mesothelioma, . . . a single fiber can cause genetic error . . . . [T]he

40

more a person is exposed to it, the more likely it is that these events occur, because every time fibers are added, it makes it more likely that a fiber is going to be available to cause genetic damage." *Id.* at 63:16–25.

The uncontradicted expert testimony in this case thus demonstrated that mesothelioma and asbestosis are different diseases whose development requires asbestos exposure of a different nature and degree. Nothing in *Lohrmann* suggests that trial courts are precluded from tailoring jury instructions on causation to the disease-specific evidence produced in individual cases. *See, e.g.*, *United States v. Heredia*, 483 F.3d 913, 920 (9th Cir. 2007) (en banc) (noting that the district court has discretion "to tailor the [jury] instruction to the particular facts of the case"); *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996) (same).

The Court's causation instruction was not erroneous or inconsistent with *Lohrmann*. This is not a basis for granting a new trial. *See Bryant*, 333 F.3d at 543.

### B. Damages

At the close of the evidence, the Court instructed the jury that if it found Covil liable on Ms. Finch's negligence claim, her failure to warn claim, or both, she was entitled to recover actual damages proximately caused by Covil, including "pain and suffering experienced by Mr. Finch before his death, and the present monetary value of Mr. Finch to his next-of-kin, here, his wife, Ann Finch, and his three children." Doc. 501 at 110:12–15. The jury returned a verdict of $32.7 million. Doc. 489.

Covil does not challenge the Court's instructions on damages. Rather, it relies on the same claims of evidentiary error and improper arguments by plaintiff's counsel to

41

assert that the jury's damage award was excessive and inflamed by passion or prejudice. It asks the Court to either set aside the verdict entirely in favor of a new trial, Doc. 505 at 15–19, or, in the alternative, to order a remittitur to $2,000,000. *Id.* at 19–22.

The Court in its discretion finds that Covil has not met its burden to show that the jury's verdict was excessive, that it was rendered under the influence of passion or prejudice, or that the jury did not follow the Court's instructions. While the verdict was large, the plaintiff's evidence on damages was compelling and virtually uncontradicted. The jury was attentive during the trial, and Covil had a full and fair opportunity to present its evidence and make its arguments. As the Court explained in *supra* Section III.A.1–2, the evidence and arguments to which Covil objects were not improper; nor were they of a nature to inspire a jury to base its verdict on passion or prejudice rather than evidence.

In a case such as this involving no significant items of measurable economic loss, "translating legal damage into money damages . . . is a matter peculiarly within a jury's ken." *Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir. 1991). Trial courts hesitate, as they should, to usurp the role of the jury in determining the amount of such intangible and non-economic damages. *See, e.g.*, *Langevine v. District of Columbia*, 106 F.3d 1018, 1024–25 (D.C. Cir. 1997); *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 212 (D.D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013). Covil has not made a persuasive showing that the jury based its verdict on passion or prejudice or failed to follow the law, and the Court declines to substitute its judgment for that of the jury.

For these reasons and those that follow in more detail, and based on the record, the Court's experience during the trial, its observations of the witnesses, the strength of the

evidence, and the applicable North Carolina law, Covil's motion for a new trial on damages or for remittitur will be denied.

## 1. Wrongful Death Damages

As relevant here, wrongful death damages under North Carolina law include compensation for pain and suffering of the decedent and the present monetary value of the decedent to his wife and children, the persons entitled to receive the damages. N.C. Gen. Stat. § 28A-18-2(b)(2), (4). The "present monetary value of the decedent" includes "but [is] not limited to compensation for the loss of the reasonably expected . . . [n]et income of the decedent," for the value of "[s]ervices, protection, care and assistance of the decedent, whether voluntary or obligatory," and for the "[s]ociety, companionship, comfort, guidance, kindly offices and advice of the decedent." *Id.* at (b)(4).

Damages for present monetary value of the decedent to next of kin and damages for pain and suffering are not capable of exact ascertainment. *Bowen v. Constructors Equip. Rental Co.*, 283 N.C. 395, 419–20, 196 S.E.2d 789, 805–06 (1973). "The present monetary value of the decedent to the persons entitled to receive the damages recovered will usually defy any precise mathematical computation." *Brown v. Moore*, 286 N.C. 664, 673, 213 S.E.2d 342, 348 (1975). Pain and suffering damages are similarly not subject to any "fixed formula." N.C. Pattern Jury Instr. Civil 810.08; *see generally Caudill v. Smith*, 117 N.C. App. 64, 70, 450 S.E.2d 8, 13 (1994) ("[T]he preferred method of jury instruction is the use of the approved guidelines of the North Carolina Pattern Jury Instructions.").

For pain and suffering damages, "[t]he jury's ultimate task" is "somehow to assign a monetary value to the injured party's intangible losses attributable to pain, suffering, disfigurement and disablement if there is evidence of these losses." *Weeks v. Holsclaw*, 306 N.C. 655, 661, 295 S.E.2d 596, 600 (1982). Subject to a cautionary instruction, it is appropriate for counsel to suggest an amount per unit of time, since "consciously or subconsciously, juries probably assign some value to some unit of time during which the losses persisted in arriving at their ultimate answer to the damages issue, whether or not such an approach is suggested to them by counsel." *Id.* at 662, 295 S.E.2d at 601.

Nevertheless, damages "must be proved to a reasonable level of certainty, and may not be based on pure conjecture." *DiDonato v. Wortman*, 320 N.C. 423, 431, 358 S.E.2d 489, 493 (1987) (citing *Norwood v. Carter*, 242 N.C. 152, 156, 87 S.E. 2d 2, 5 (1955) ("No substantial recovery may be based on mere guesswork or inference . . . without evidence of facts, circumstances, and data justifying an inference that the damages awarded are just and reasonable compensation for the injury suffered.")). While damage "awards based on sheer speculation would render the wrongful death statute punitive in its effect, which is not what the legislature intended," *id.* at 431, 358 S.E.2d at 493, "some speculation is necessary in determining damages under our wrongful death statute." *Estate of Hendrickson v. Genesis Health Venture, Inc.*, 151 N.C. App. 139, 152, 565 S.E.2d 254, 262 (2002); *Brown*, 286 N.C. at 673, 213 S.E.2d at 348–49. "[T]he assessment of [wrongful death] damages must, to a large extent, be left to the good sense and fair judgment of the jury." *Brown*, 286 N.C. at 673, 213 S.E.2d at 348.

## 2. New Trials Based on Excessive Verdicts

The grant or denial of a motion for a new trial requires the trial court to exercise its discretion. *Wadsworth v. Clindon*, 846 F.2d 265, 266 (4th Cir. 1988). "This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996).

A district court sitting in diversity must apply substantive state law standards when it considers a motion for a new trial under Rule 59(a) or for remittitur based upon the alleged excessiveness of the jury's compensatory damage award. *Id.* at 438–39; *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999); *see also Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279–80 (1989) (refusing to craft a federal common-law standard of excessiveness because "these are matters of state, and not federal, common law"). This means that the "substantive component of a state's law concerning the excessiveness of a verdict" is binding on the court. *Steinke v. Beach Bungee*, 105 F.3d 192, 197 (4th Cir. 1997).[20] Courts determine whether a verdict is excessive under state law in the exercise of their discretion. *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 334 (4th Cir. 2013).

Under North Carolina law, a new trial may be granted for "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice." N.C. Gen. Stat. § 1A-1, Rule 59 (a)(6); *see also Rhyne v. K-Mart Corp.*, 358

---

[20] To the extent federal cases predating *Gasperini* apply federal substantive law in diversity cases to the question of whether a jury's verdict is excessive, those cases are no longer good law.

N.C. 160, 168, 594 S.E.2d 1, 8 (2004). "In determining whether a damages award was excessive or inadequate due to the influence of passion or prejudice, the trial judge must consider the testimony and evidence presented at trial." *Guox v. Satterly*, 164 N.C. App. 578, 581, 596 S.E.2d 452, 455 (2004); *accord Andrews v. Peters*, 318 N.C. 133, 140, 347 S.E.2d 409, 413–14 (1986). "Such a determination requires a consideration of the entire record." *Guox*, 164 N.C. App. at 582, 596 S.E.2d at 455. North Carolina trial courts "have traditionally exercised their discretionary power to grant a new trial in civil cases quite sparingly in proper deference to the finality and sanctity of the jury's findings." *Worthington v. Bynum*, 305 N.C. 478, 482, 487, 290 S.E.2d 599, 602, 605 (1982) (noting also the authority of state "trial judges . . . to set aside the verdict whenever in their sound discretion they believe it necessary to attain justice for all concerned").

In *Worthington,* the trial court granted a new trial on compensatory damages in a motor vehicle negligence case based on its conclusion that the verdict was excessive. *Id.* at 481, 290 S.E.2d at 602. The Court of Appeals reversed, but the North Carolina Supreme Court vacated the reversal and reinstated the trial court's order. The Supreme Court noted that trial courts are best situated to make the discretionary determination of whether to grant or deny a new trial, including on the grounds that a verdict was excessive, "[d]ue to their active participation in the trial, their first-hand acquaintance with the evidence presented, their observances of the parties, the witnesses, the jurors and the attorneys involved, and their knowledge of various other attendant circumstances." *Id.* at 487, 290 S.E.2d at 605.

North Carolina case law is clear that there must be evidence of, and a finding that, the verdict was influenced by passion or prejudice before it is appropriate to set aside a jury verdict as to the amount of damages. In *Worthington*, for example, the trial judge noted that "things that seemed to me to be improper . . . kept coming up" and "[i]t was an extremely volatile situation." *Worthington,* 305 N.C. at 480, 290 S.E.2d at 601. In upholding the trial court's decision to set aside the verdict, the Supreme Court quoted with approval a 1902 decision which observed that while trial judges are and should be reluctant to set aside damages awards merely because they are against the weight of the evidence, it may be appropriate to do so if "prejudice in the community. . . has brought about a result which the judge sees is contrary to justice." *Worthington*, 305 N.C. at 483, 290 S.E.2d at 603 (quoting *Bird v. Bradburn*, 131 N.C. 488, 489, 42 S.E. 936, 937 (1902)).

Similarly, in *Greene v. Royster*, the North Carolina Court of Appeals noted that the mere fact that a jury "concluded its deliberations quickly, is hardly evidence of passion and prejudice *per se*." 187 N.C. App. 71, 81, 652 S.E.2d 277, 283 (2007). And in *Everhart v. O'Charley's, Inc.*, the North Carolina Court of Appeals upheld a trial court's denial of the defendant's motion for a new trial on punitive damages where the defendant had "point[ed] to nothing in the record—except the award itself—that might indicate that the jury disregarded the trial court's instructions or awarded punitive damages under the influence of passion or prejudice." 200 N.C. App. 142, 161, 683 S.E.2d 728, 742 (2009); *see also Brown*, 286 N.C. at 674, 213 S.E.2d at 349 (noting that

"[i]t is only when the jury has arbitrarily disregarded the law and the evidence that the judge must exercise his judicial discretion and set the verdict aside").[21]

In a case applying North Carolina law to an excessive verdict question, the Fourth Circuit indicated that it is also appropriate to evaluate the nature and sufficiency of the evidence in support of the damages claim and whether counsel's arguments on damages invited the jury to award an arbitrary amount rather than one based on the evidence. *Fontenot*, 736 F.3d at 335. This is consistent with the requirement under North Carolina law that the court's "determination requires a consideration of the entire record," *Guox*, 164 N.C. App. at 582, 596 S.E.2d at 455, and that wrongful death damages not be unduly speculative. *Hendrickson*, 151 N.C. App. at 152, 565 S.E.2d at 262.

In *Fontenot*, the seventeen-year-old decedent died almost immediately upon being struck by an electrical current from a taser fired by a police officer, and there were no

---

[21] North Carolina appellate courts routinely affirm trial court decisions denying motions for new trials based on claims of excessive verdicts. *See, e.g.*, *Roberts v. Locke*, 821 S.E.2d 903 (table), 2018 WL 6614066, at *6–7 (N.C. Ct. App. Dec. 18, 2018); *Brown v. Cox*, 809 S.E.2d 923 (table), 2018 WL 944412, at *3–4 (N.C. Ct. App. Feb. 20, 2018) (upholding denial of new trial on damages after remittitur); *Haarhuis v. Cheek*, __ N.C. App. __, __, 805 S.E.2d 720, 728– 29 (2017); *Everhart*, 200 N.C. App. at 160–61, 683 S.E.2d at 742; *Greene*, 187 N.C. App. at 81, 652 S.E.2d at 283–84; *Ferrell v. Frye*, 108 N.C. App. 521, 528, 424 S.E.2d 197, 201 (1993); *Hanna v. Brady*, 73 N.C. App. 521, 525–28, 327 S.E.2d 22, 24–26 (1985); *Kremer v. Food Lion, Inc.*, 102 N.C. App. 291, 296–97, 401 S.E.2d 837, 839–40 (1991). Indeed, Covil has not cited, nor has this Court found, any appellate opinions by North Carolina courts reversing a trial court's decision to deny a motion for a new trial based on the alleged excessiveness of the verdict. *See Massengill v. Bailey*, 802 S.E.2d 918 (table), 2017 WL 3027593, at *11 (N.C. Ct. App. July 18, 2017) ("Defendant cites to no appellate opinions of this State wherein a trial court was found to have abused its discretion by denying a motion for a new trial . . . based upon an alleged 'grossly excessive' jury verdict, and we find none."); *Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 426, 424 S.E.2d 181, 188, *aff'd*, 334 N.C. 682, 435 S.E.2d 71 (1993) (collecting cases and noting that "[w]e have not found any cases finding an abuse of discretion for failure to order a new trial on the basis of excessive damages in North Carolina.").

pain and suffering damages. 736 F.3d at 321–23, 335 n.15. The Fourth Circuit gave two

reasons which, taken together, caused it to reverse the trial court's decision not to award a

new trial on damages and instead to remit the award. First, the plaintiffs relied in

substantial part on the value of the decedent's services to his parents, but "there was no

testimony concerning whether, and for what duration, [the decedent's] parents reasonably

expected [the decedent] to continue providing services such as babysitting his younger

siblings and assisting with household chores," *id.* at 335, which is required under North

Carolina law. *See id.*; *Bahl v. Talford*, 138 N.C. App. 119, 126–27, 530 S.E.2d 347, 352

(2000). Second, plaintiff's counsel suggested in closing argument that the jury could

base its verdict on an "arbitrary" number, "like $1,000 [or] . . . $2,000 for a week,"

without providing evidentiary support for those numbers. *Fontenot*, 736 F.3d at 335.

Under these circumstances, the Fourth Circuit held, the plaintiff's lawyer "essentially

invited the jury and the district court to engage in the type of 'pure conjecture' that North

Carolina courts have prohibited." *Id.*

Consistent with these cases, then, the decision about whether a verdict is excessive

cannot be based merely on the size of the verdict. Rather, there must be some indication

that the jury's verdict was based on passion or prejudice or that it did not follow the law

in some way, such as by awarding damages based on speculation rather than evidence.

### 3. Evidence on Damages

The evidence about the nature and extent of Mr. Finch's pain and suffering and of

his close relationship with, and value to, his wife and children was largely undisputed.

Before he developed mesothelioma, Mr. Finch was healthy and active, participated

regularly in the lives of his adult children, and provided extensive emotional support and companionship to his wife, the plaintiff Ann Finch. Leading up to and after his diagnosis, he experienced extensive and life-altering pain from both the disease itself and the treatment required, which involved surgery, hospitalizations, and a colostomy.

Covil did not put on evidence about damages and offered little to no cross-examination of witnesses who testified about damages. Nor did Covil substantively address damages during opening statements, *see* Doc. 497 at 97:5–16 (noting Covil was not contesting the pain Mr. Finch suffered as a result of his mesothelioma or the loss sustained by his family, just Covil's liability), or in closing arguments. Doc. 501 at 80:20–24 ("All I will say is, that if you reach this issue, you'll be instructed to use your logic and your commonsense in determining damages. However, . . . you do not need to reach the issue of damages, if you do not find liability.").

### a. Pain and Suffering

Mr. Finch first showed symptoms in February 2016, at the age of 78. Doc. 498 at 160:1–2. Until that time, he had been healthy and active. *See, e.g.*, *id.* at 33:9–10. He was long retired from his work at Firestone, but he regularly worked cutting grass, *id.* at 193:11–195:24, which he "thoroughly enjoyed" because it was outdoors and allowed him to be his own boss. *Id.* at 43:11–17.

His symptoms began with pain, bloating, and discomfort in his abdomen and back. *Id.* at 160:1–6. Initially, his family teased him about gaining weight, attributing it to his recent marriage. *Id.* at 33:14–34:8. But the matter became serious when doctors discovered pleural plaques and peritoneal tumors and diagnosed Mr. Finch with

mesothelioma.  *Id.* at 82:7–21, 97:12–21, 160:6–161:13; *see also id.* at 88:10–19, 89:20–90:15, 100:20–101:10 (describing the pleura, pleural plaques, and the peritonea).

Dr. Holstein testified that pleural mesothelioma "is one of the most painful cancers to have, and that is because there are so many nerve endings in the pleura."  *Id.* at 98:2–17 ("[I]f you laugh, it hurts.  If you sneeze, it hurts.  If you cough, it hurts. . . . [I]t is an extremely painful cancer.").  There is no cure for mesothelioma.  *Id.* at 83:3–8.

Mr. Finch accumulated "quarts of fluid" in the "pleural space" which had to be drained.  *Id.* at 97:19–25.  On April 24, 2016, Mr. Finch underwent "debulking surgery, . . . whose objective is to take out as much tumor as possible, even though they knew they couldn't get it all [or] cure him."  *Id.* at 161:13–20.  Surgeons removed over 25 pounds of tumor and "removed the right side of his colon, most of his rectum, the spleen, [and] the omentum," pouring chemotherapy solution into his abdomen to expose the remaining tumors and later draining the solution.  *Id.* at 161:19–162:6; *see also id.* at 36:14–25.

Mr. Finch developed serious complications after the surgery, including a perforated bowel and an internal infection, and he stayed in the hospital for over a month.  *Id.* at 36:1–13, 162:13–163:3.  Surgeons had to reopen the incision to administer antibiotics "and to have a sterile packing put into the wound . . . to soak up pus from the infection."  *Id.* at 163:3–6.  Doctors could not close the incision after this procedure because "you can't just sew it up when it's infected."  *Id.* at 163:9.  The sterile packing in the wound had to be changed daily, "which is usually painful," and the "wound [was kept] open and gradually step-by-step heal[ed] very slowly."  *Id.* at 163:3–12.

As a result of the surgery and for the rest of his life, Mr. Finch had a colostomy bag, where "the feces would drain instead of the normal way of going to the bathroom." *Id.* at 162:7–12; *see also id.* at 37:1–8. Mr. Finch had to empty the colostomy bag two to three times a day and change the bag every four or five days. *Id.* at 37:10–13.

When he was discharged, Mr. Finch "still had one drain coming out of his abdomen." *Id.* at 163:13–14. He went to a rehabilitation facility for about five weeks and needed in-home care for a month after that. *Id.* at 38:19–23, 163:19–24.

In October 2016, Mr. Finch "could[] hardly breath[e]" and returned to the hospital. *Id.* at 39:3–5. Doctors discovered he had a collapsed lung, "probably" due to the surgery, and removed a liter of fluid from around the lungs. *Id.* at 39:5–8. A CAT scan confirmed the mesothelioma had spread. *Id.* at 164:6–8.

After the fluid removal, Mr. Finch was pain-free for a time, though he was still dealing with the colostomy bag and with fatigue. *Id.* at 39:9–11. Within a few weeks, he again had shortness of breath. *Id.* at 164:13–17. Back in the hospital, doctors removed another quart of fluid from his chest. *Id.* at 164:13–18. He experienced more abdominal pain, and doctors feared his abdomen was "getting blocked" by tumor and scar tissue; they inserted a tube into his stomach to suction out fluids and gas. *Id.* at 164:20–25. After discharge, his condition gradually worsened, and he needed oxygen. *Id.* at 165:1–2.

On January 7, 2017, his family took him to the emergency room where he underwent extensive tests and, ultimately, was airlifted to a hospital in Winston-Salem. Doc. 500 at 29:18–20. Mr. Finch had never flown before and was scared; however, no family member could accompany him on the flight. *Id.* at 29:20–30:1. After his

discharge a short time later, Mr. Finch went into in-home hospice care. *Id.* at 30:13–14. On January 25, 2017, Mr. Finch died at home. Doc. 498 at 165:5–6.

His illness and treatment caused him to miss several important family events, with concomitant emotional pain. For example, Mr. Finch could not attend an annual family reunion because he was in a nursing facility," Doc. 500 at 34:21–35:11, and he also had to shorten his time and involvement in his grandson's wedding. *Id.* at 33:10–25.

Dr. Holstein testified that "when people die of cancer, the last month is usually not very pretty, but this poor gentleman, he had eight months of a terrible, terrible course." Doc. 498 at 166:2–4. Through testimony taken before his death, Mr. Finch told the jury that his mesothelioma diagnoses "scared [him] to death," *id.* at 35:11–15, that it made him "a different person," and that he didn't "feel as good about [himself]" because "I can sit right here and I can hear my stomach—coming out . . . into this colostomy bag. I can feel it and I can hear it. Sometimes people sitting at the table can hear it." *Id.* at 40:17–21. After the surgery, Mr. Finch testified he no longer felt "comfortable away from home," *id.* at 41:6–10, fearing his colostomy bag would develop a problem or start leaking in public. *Id.* at 42:11, 43:23–25. On one occasion, the bag started leaking while Mr. Finch was in church, and he had to leave the service. *Id.* at 42:11–14.

Neither the plaintiff nor Covil presented any hard numbers as evidence of the value of Mr. Finch's pain and suffering, and it is difficult to think of any that could be offered. *See* N.C. Pattern Jury Instr. Civil 810.08 (noting damages for pain and suffering are not subject to any fixed formula.). It is unlikely that expert opinion as to value would be helpful to the jury on such an issue, and "golden rule" evidence would be improper.

*See Fox-Kirk v. Hannon*, 142 N.C. App. 267, 278–79, 542 S.E.2d 346, 355 (2001) (holding golden rule arguments in closing and in jury instructions, which ask the jury to put themselves in the position of the victim, are improper). The fact that there was no evidence placing a dollar amount on Mr. Finch's pain and suffering does not undermine the compelling and uncontradicted evidence that his pain and suffering were substantial.

### b.  Value to his Wife and Children

The evidence about Mr. Finch's relationship with his children and his wife was similarly compelling and uncontradicted. It showed that, absent his mesothelioma, Mr. Finch's family likely would have had nine to fourteen more years with him in their lives.

Based on Mr. Finch's medical history, Dr. Holstein testified that Mr. Finch "was an unusually healthy 78 year old when he first developed the symptoms of his malignant mesothelioma." Doc. 498 at 157:20–21. Under North Carolina's Life Tables, Mr. Finch's life expectancy at 78 was 9.5 years, N.C. Gen. Stat. §8-46, but given his health history and demographic characteristics, Dr. Holstein estimated that he would have lived another "13 or 14 years" if he hadn't contracted mesothelioma. Doc. 498 at 159:4–18. Other record evidence of Mr. Finch's good health and level of physical activity supported Dr. Holstein's testimony, *see, e.g.*, *id.* at 41:17–43:17, 193:11–195:24, and Covil pointed to nothing to the contrary in its statements to the jury. *See* Doc. 497 at 91:25–99:2 (Covil's opening statement); Doc. 501 at 73:13–90:6 (Covil's closing statement).[22]

_____

[22] There was evidence that Mr. Finch smoked for much of his life, *see, e.g.*, Doc. 498 at 190:19–23, but Covil did not argue this reduced his life expectancy. The uncontroverted testimony was that smoking "has nothing to do with mesothelioma." *Id.* at 100:10–19, 108:15–

Mr. Finch testified he was very close with his immediate and extended family. Doc. 497 at 128:12–15. He had three adult children who lived nearby and whom he saw on a weekly basis, and "[s]ometimes more often than that." *Id.* at 128:24–129:14. Mr. Finch's daughter, Lynn Gurgone, testified that family meant "everything" to Mr. Finch and that he enjoyed annual family reunions with extended family. Doc. 500 at 31:11–16, 34:21–35:11. Mr. Finch was helpful to all three of his children, and if "[a]nything was wrong, dad could fix it." *Id.* at 28:24–29:5.

Mr. Finch had five grandchildren and one great-grandchild, was active in their lives, and was "very" close with them. Doc. 497 at 129:17–21; Doc. 500 at 31:6–10. He regularly looked after them and attended their sporting events, their birthday parties, and their graduations. Doc. 498 at 41:17–42:7; Doc. 500 at 31:6–10. It can hardly be disputed that having an active grandparent was valuable to Mr. Finch's children, who were the parents of those grandchildren.

Mr. Finch was married for 54 years to his first wife, the mother of his three children. Doc. 497 at 128:24–129:1, 130:8–9. She passed away in 2009, Doc. 500 at 32:13–15, and Mr. Finch remarried the plaintiff here, Ann, in 2013. Doc. 497 at 128:1–4.

Ann Finch testified that she and Mr. Finch had known each other for decades before their first date. Doc. 500 at 37:17–38:4. She met Mr. Finch around the time she married her first husband, Buddy. *Id.* at 37:20–21. Mr. Finch was their insurance salesman, and he later mowed their lawn. *Id.* at 37:21–23, 38:10–13. After Buddy

_____

16. Dr. Holstein was aware of Mr. Finch's history of smoking, *id.* at 158:1–2, and opined without contradiction that Mr. Finch would have lived another 13 or 14 years. *Id.* at 159:4–18

passed away in 2007, *id.* at 38:21–22, Mr. Finch's sister tried to convince him to ask Ann on a date, but according to Ann, he "didn't have enough nerve to do it." *Id.* at 39:4–11. Eventually, Mr. Finch "got up enough nerve to call," and Ms. Finch accepted the invitation. *Id.* at 39:13–15. On their first date, Ms. Finch testified that Mr. Finch was so nervous he sat in the car outside her house for five minutes "sweating" and "scared," but they ended up having a "great" time. *Id.* at 39:17–40:1. He took her to the beach to propose. *Id.* at 40:12–17.

According to Ms. Finch, Mr. Finch "would do anything in the world" for her, *id.* at 41:2–3, 45:11–14, he was "very romantic" and "sentimental," and he would often leave love notes for her to find around the house. *Id.* at 41:20–23, 43:2–13; *see also id.* at 32:13–33:4. Ms. Finch said they were "[a]lways" close to each other, and that he "never wanted to get far away from me," even if they were just in different rooms of the house. *Id.* at 41:24–42:18.

Ms. Finch testified that she and Mr. Finch's children "were by his side all the time" during his illness, that his children took turns visiting him in the hospital, and that she helped him with his colostomy bag. *Id.* at 47:3–48:5. After his surgery, Mr. Finch was not able to babysit or play with his grandchildren or to watch them play sports; he could no longer walk his dog, and he had to use an electric scooter at the grocery store. Doc. 498 at 41:9–42:9, 43:5–10.

After Mr. Finch's death, Ms. Finch experienced several health problems, including an acid reflux flare-up and blood clots. Doc. 500 at 49:1–50:11. There was no evidence that these problems were caused by Mr. Finch's death, but his death deprived Ms. Finch

of Mr. Finch's assistance, comfort, and emotional support during her treatment and hospitalization, when she had trouble walking, and otherwise during her struggle with her other health problems. *Id.* at 50:12–17.

Beyond passing mention of the relatively small amount of money Mr. Finch earned cutting grass, *see, e.g.*, Doc. 498 at 197:14–15, the plaintiff did not present any hard numbers as evidence of his monetary value to his family. Neither the witnesses nor plaintiff's counsel focused on his expected net income or the monetary value of his services, instead concentrating on the emotional loss of his "society, companionship, comfort, guidance, kindly offices and advice." N.C. Gen. Stat. § 28A-18-2(b)(4); *see* Doc. 501 at 70:20–22 (plaintiff's closing argument that "we're not here because he made 15 or $50,000 mowing lawns. . . . That's not why we're here."). It is well established that these losses for companionship, guidance, and advice defy precise computation, *Brown*, 286 N.C. at 673, 213 S.E.2d at 348–49, and Covil has not identified any evidence that could have been produced to place a number on these kinds of losses. It would be ridiculous, for example, to contend that the loss of companionship and comfort of a father or husband could be replaced by hiring a stranger at an hourly wage.

The evidence was compelling that Mr. Finch's death deprived his next of kin—his widow and his three children—of 14 years of his society, comfort, guidance, advice, and companionship. It is undisputed that these losses were of a substantial value.

### 4. Analysis

As discussed in *supra* Section III.B.2, a court should not set aside a jury's award as excessive unless it was based on passion or prejudice or the jury did not follow the law

in some way, such as by awarding damages based on sheer speculation. The amount of the verdict by itself is insufficient to show that it was based on passion or prejudice or that the jury disregarded the court's instructions—the defendant must point to something in the record to make the requisite showing. *See Everhart*, 200 N.C. App. at 161, 683 S.E.2d at 742; *see also Guox*, 164 N.C. App. at 581–82, 596 S.E.2d 452, 454–55.

In asking for a new trial or remittitur, Covil initially pointed only to the same purported errors it identified in connection with its argument for a new trial on liability, making the same inaccurate or cursory arguments, *see supra* Section III.B, and contending that the size of the verdict was evidence that those errors inflamed the jury. Doc. 505 at 9–12, 15–19. In its reply brief, Covil focused in more detail on the admission of what it called improper character evidence, Doc. 510 at 4–6, and raised new objections to additional parts of the plaintiff's closing argument, *id.* at 8, in support of its contention that the verdict was excessive as a result of passion or prejudice. *Id.* at 6–11. Finally, Covil contends that the amount of the verdict is out of line with other wrongful death verdicts. Doc. 505 at 19–22.

None of these arguments is sufficient to establish that the jury's verdict was excessive, based on passion or prejudice, or that the jury misapplied the Court's instructions. Any errors or improper argument were minor, and nothing in the record indicates the jury did not follow the law or apply it to the facts.

As discussed in *supra* Section III.A.1–2, the Rule 30(b)(6) testimony and evidence contradicting it were not impermissible character evidence, and the closing arguments by plaintiff's counsel were grounded in the evidence, relevant, and not unduly

prejudicial.  By its very nature, a plaintiff's negligence claim focuses on whether the defendant has breached a duty and behaved unreasonably, and all evidence which proves liability is prejudicial to some extent or it would not be relevant.  There is no unfair prejudice from evidence properly admitted or from argument supported by reasonable inferences from such evidence.

It is true that counsel for the plaintiff spoke strongly about Covil's negligence, as is often the case in closing arguments about fault and credibility.  But it is not improper to make a closing argument which aggressively and persuasively identifies the evidence supporting a finding of negligence and responds to the arguments and contentions of the other side disputing liability.  The plaintiff was entitled to direct the jury's attention to evidence favorable to the plaintiff's case and to link Covil's negligence to the damages incurred.  Nowhere did plaintiff's counsel ask the jury to award a large amount in damages as a punishment for Covil's inaccurate testimony about when it stopped selling asbestos.  Indeed, counsel several times reminded the jury that the purpose of money damages was not to punish.  Doc. 501 at 68:9–14, 71:10–11; *see also id.* at 38:2–5 (arguing that "the law here doesn't ever ask the question, how much should Covil pay," but rather, "what are the losses worth for this family").

The Court also instructed the jury that the purpose of damages was to make injured persons whole, not to punish negligent actors.  *Id.* at 113:16–21.  There is nothing to indicate that these arguments on liability caused the jury to render a damages verdict based on passion or prejudice.

To the extent Covil contends that the "cumulative impact" of minor errors inflamed the passion or prejudice of the jury, *see* Doc. 510 at 7, this argument is also without merit. The "cumulative impact" argument "does not exist as a last-ditch, dump-truck tactic to avoid an unfavorable verdict." *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 897 (E.D. Wis. 2017). To prevail, Covil must provide a "logical bridge connecting the errors and an explanation as to how they affected the verdict." *Id.* Here as in *Snap-On*, Covil has provided no such bridge. At root, Covil is merely challenging the size of the award. As North Carolina law makes clear, this is insufficient.

Covil does not assert that the jury speculated in reaching its verdict.[23] Indeed, it would be difficult to do so in this case, which involved substantial evidence of intangible and non-economic damages. It is impossible to offer any hard evidence of the dollar amounts related to pain and suffering or of the value of the companionship, advice, and guidance of a father and husband. By definition, these damages are not subject to hard and fast calculations, and, as discussed in *supra* Section III.B.1, any effort to quantify such emotional losses is unlikely to be admissible. During closing argument, plaintiff's counsel acknowledged the difficulties inherent in this decision and did nothing to encourage the jury to speculate. To the contrary, she repeatedly linked her damages arguments to the Court's instructions. *See, e.g.*, Doc 501 at 67:16–22. In the

---

[23] In its briefing, Covil did note in passing that verdicts cannot be "based on sheer speculation," Doc. 505 at 18, but it otherwise did not make any argument that the verdict was, in fact, based on speculation.

circumstances of this case, a verdict of $32.7 million is no more speculative than a verdict of $2 million, which Covil suggests as a remittitur without any explanation as to how that amount is linked in any specific way to the evidence in this case. Doc. 505 at 22.

Covil contends it is proper to look to damages awards in other wrongful death cases to determine whether the award in this case is excessive and that an analysis of awards in comparable cases suggests that the award here is excessive and warrants remittitur. Doc. 505 at 19–22. Covil cites no North Carolina decision that has ever compared the verdict in the case under consideration to verdict amounts in other cases to evaluate whether the damages award was excessive, and this approach has been the subject of extensive scholarly debate[24] and disagreement between courts.[25]

---

[24] *See, e.g.*, Hillel J. Bavli, *The Logic of Comparable-Case Guidance in the Determination of Awards for Pain and Suffering and Punitive Damages*, 85 U. Cin. L. Rev. 1, 4–5 (2017); J. Patrick Elsevier, *Out-of-Line: Federal Courts Using Comparability to Review Damage Awards*, 33 Ga. L. Rev. 243, 251–58, 243–79 (1998) (collecting and discussing cases and different approaches); David Baldus et al., *Improving Judicial Oversight for Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards of Nonpecuniary Harms and Punitive Damages*, 80 Iowa L. Rev. 1109, 1179–80 (1995).

[25] The Fourth Circuit has authorized the comparative-verdict approach in cases involving federal causes of action resulting in emotional distress, *see, e.g.*, *Hetzel v. Cty. of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996); *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 673 (4th Cir. 2015), but it does not require such a review. *See Johnson v. City of Charlotte, N.C.*, 869 F.2d 594 (table), 1989 WL 14276, at *7 (4th Cir. 1989) ("The City would have us compare the damages awarded here to the jury awards in other cases; but we need say only that such comparisons are futile"); *see also EEOC v. CONSOL Energy, Inc.*, No. 1:13CV215, 2016 WL 538478, at *11 (N.D.W. Va. Feb. 9, 2016) ("*Jones* simply approved the use of the comparative approach in determining whether a damage award was excessive, but did not require such analysis."), *aff'd*, 860 F.3d 131 (4th Cir. 2017). The circuits otherwise take varying approaches, *see* Elsevier, *supra* note 24, at 251–58 (collecting and discussing cases and different approaches), and several state courts prohibit such comparisons outright. *See, e.g.*, *Allied Concrete Co. v. Lester*, 736 S.E.2d 699, 708 (Va. 2013); *see also infra*.

There are good reasons to think that North Carolina would not adopt a comparative-verdict approach. For one, the North Carolina Supreme Court has emphasized the need to give deference to trial judges on the excessiveness determination because of "their active participation in the trial, their first-hand acquaintance with the evidence presented, their observances of the parties, the witnesses, the jurors and the attorneys involved, and their knowledge of various other attendant circumstances." *Worthington*, 305 N.C. at 487, 290 S.E.2d at 605. The Supreme Court's reasoning for deferring to the trial court is inconsistent with a comparability review, at which the appellate court would be just as competent as the trial court.

Relatedly, North Carolina courts consistently emphasize the need to base the excessiveness determination on record evidence in the case at bar. *See, e.g.*, *Guox*, 164 N.C. App. at 582, 596 S.E.2d at 455. This is similar to the approach of other state courts that reject comparative-verdict analysis as inconsistent with particularized justice and insensitive to the factual differences between and among cases.[26]

While the comparability approach gives the appearance of an objective counterweight to the jury's subjective analysis of intangible losses, that appearance is

---

[26] *Cf., e.g.*, *Washburn v. Beatt Equip. Co.*, 840 P.2d 860, 871 (Wash. 1992) (en banc) (holding the comparability approach "is inimical to the foundation of particularized justice. Defendant would consign damages for personal injuries to the cold world of accounting balance sheets. In effect, defendant argues that a verdict can never exceed what has historically been awarded for what defendant conceives to be comparable injuries—so much for a particular injury and no more, ever."); *Moteberg v. Johnson*, 210 N.W.2d 27, 31 (Minn. 1973) ("In considering whether a verdict is excessive, a comparison with previous verdicts is not justified because of the variations in facts and changes in the economy."); *Schrib v. Seidenberg*, 458 P.2d 825, 829 (N.M. Ct. App. 1969) ("The comparisons are improper because the propriety of the amount of the damages awarded must be determined from the evidence in the case under consideration.").

often illusory. As the briefing in this case shows, it is not easy to define which cases are comparable and it is even harder to locate them for comparison. A comparison is only helpful if the cases are comparable, yet the information available in a reported decision is often incomplete or non-specific. Many verdicts are not reflected in reported decisions, and settlements amounts, which would also seem relevant in a comparability analysis, are opaque and even more difficult to obtain. But even if the Court had a comprehensive list of comparable cases, factual differences would still exist, and evaluating the significance of those differences would raise its own challenges.

Here, it is not clear that the North Carolina verdicts identified by Covil, Doc. 505 at 20, were rendered in cases comparable to this one, as Covil provides no details for most cases, and for others, the period of pain and suffering was substantially shorter and the family relationships were different. Reviewing verdicts in mesothelioma cases from other states, *see* Doc. 521-2, would require the Court to evaluate whether the law on damages is different in a way that might have affected the verdict and to review scores of pages of materials from other trials to determine if the evidence was similar and the damages were "comparable." *See* Doc. 521-3 through 521-21. The Court declines this invitation and concludes in its discretion that a comparative approach would not be beneficial here.[27]

The Court also declines Covil's implicit invitation to rely on its gut reaction to the size of the verdict based on its experience. *See* Doc. 505 at 15–18. Such subjective

---

[27] Covil has filed a motion for leave to file a supplemental brief, which attaches materials from other cases. For the reasons stated, this motion, Doc. 520, will be denied.

reactions by the presiding judge are no more reliable, accurate, or non-speculative than the jury's considered judgment. *See Brown*, 286 N.C. at 674, 213 S.E.2d at 348–49 (noting that the assessment of wrongful death damages "must, to a large extent, be left to the good sense and fair judgment of the jury."). To the extent the Court's subjective reaction is appropriate to consider, this case is a far cry from the case relied upon by Covil, *Scagnelli v. Whiting*, 554 F. Supp. 77 (M.D.N.C. 1982). There, the size of the verdict "shocked the conscience of the Court" in light of the plaintiff's thin evidence on damages and the defendant's "strong and largely uncontroverted" evidence. *Id.* at 80–82. Here, in contrast, the size of the verdict may have been a bit surprising, but, upon reflection, it was not shocking given the strength of the plaintiff's evidence and the weaknesses of Covil's defense.

### 5. Conclusion on Damages

The verdict in this case was sizable, but the plaintiff's evidence on damages was compelling and virtually uncontradicted. Covil has not met its burden to show that the jury's verdict was excessive, that it was rendered under the influence of passion or prejudice, or that the jury did not follow the law. The Court's judgment about damages is no more accurate or reasonable than the jury's evaluation, and Covil's suggested remittitur amount is not tethered to any evidence in this case. Covil did not challenge the plaintiff's evidence on pain and suffering or loss of companionship and chose not to address damages in any substantive way in its arguments to the jury. Covil is not entitled to another trial on damages or to remittitur.

## IV.     Conclusion

The plaintiff presented evidence that was more than sufficient to support the jury's finding that Covil sold asbestos-containing insulation products to the Firestone plant at a time when it knew those products were dangerous to human health, that Covil did not warn users then or thereafter of those dangers, that Mr. Finch worked in close proximity to this pipe covering for many years on a daily basis, under circumstances which created asbestos dust, and that this exposure caused his mesothelioma and death.  Covil is not entitled to judgment as a matter of law.

The plaintiff's evidence from Covil's Rule 30(b)(6) witness and the evidence contradicting it were relevant and not unduly prejudicial, and Covil had a full and fair opportunity to contest this evidence at trial.  The Court did not "force" Covil to stipulate to portions of Mr. Waters' testimony, nor did it exclude any evidence of when Covil went out of business, and Covil may not attribute those strategic decisions to the Court.  The plaintiff's closing argument was based on the evidence and was not unfair to Covil.  The jury reasonably chose to believe the plaintiff's persuasive evidence on liability as opposed to Covil's less persuasive defenses.

Finally, the damages award was not excessive given the evidence.  Covil has not persuaded the Court that the jury was inflamed by passion or prejudice, and the Court is not obligated to compare the value this jury assigned to Mr. Finch's pain and suffering and his family's loss to the value other juries assigned in different cases.  Mr. Finch endured months of pain and suffering from an incurable disease, including several hospitalizations, surgery and other procedures, numerous complications, and an airlift to

another hospital, among other hardships.  He had a colostomy bag for months that caused him embarrassment and limited his activities and his participation in church and family events.  He endured a prolonged and painful illness and treatment.  His adult children lost an affectionate father who was involved in their lives daily, and his wife lost a loving and romantic husband after only a few years of marriage.

While the amount of the verdict is unquestionably large, the damages were unquestionably large.  Weighing the value of a man's pain and suffering and the loss of his companionship to his family are tasks best left to a jury, composed of individuals who bring diverse perspectives from the community and scores of years of life experience to the table, and who act as a unit after deliberating and evaluating the evidence together.  Legal training is of little help to these tasks, and even decades of experience as a trial judge does not make a court of one "better" than a jury at determining non-economic wrongful death damages.  *See Brown*, 286 N.C. at 674, 213 S.E.2d at 348–49.

Having heard all the evidence, observed the witnesses, listened to the arguments, and monitored the jury throughout, the Court finds that the verdict was not based on passion or prejudice and that the jury did not disregard the law.  Rather, the jury's award fairly, if generously, reflects the horrible pain and suffering Mr. Finch endured and compensates his family for their losses.  The amount of the verdict does not result in a miscarriage of justice, and Covil's request for a new trial or remittitur will be denied.

In February after a hearing, the Court granted Covil's motion to amend the judgment to reflect an appropriate set-off for amounts paid by others on account of the injuries that were the subject of this trial.  *See Harriston v. Harward*, 371 N.C. 647, 652,

821 S.E.2d 384, 388 (2018); *Holland v. S. Pub. Utilities Co.*, 208 N.C. 289, 291–92, 180 S.E. 592, 593–94 (1935) ("[W]here there are joint tort-feasors there can be but one recovery for the same injury or damage . . . . [A]ny amount paid by anybody . . . for and on account of any injury or damage should be held for a credit on the total recovery in any action for the same injury or damage"); *see also* N.C. Gen. Stat. § 1B-4.  The Court withheld entry of an amended judgment pending resolution of the motion resolved in this Order.  *See* Doc. 515.  The Court will therefore enter an amended judgment shortly which reflects the set-off.

It is **ORDERED** that:

1.  Covil's motion for judgment as a matter of law, or alternatively, for a new trial, Doc. 493, is **DENIED**.

2.  Covil's motion for leave to file supplemental brief, Doc. 520, is **DENIED.**

This the 1st day of May, 2019.

UNITED STATES DISTRICT JUDGE